UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

EDWARD LEE BENTLER,     :
                                 :
       Plaintiff,      :
                                 :     JURY TRIAL DEMANDED
   v.                 :
                                 :    NO.: _____
NICHOLAS NEDEROSTEK,    :
DANIEL NILON, GREGORY   :    (JUDGE _____)
YANOCHKO, SUSQUEHANNA  :
COUNTY, SUSQUEHANNA    :
COUNTY 911 DISPATCHER JEFF, :
SUSQUEHANNA COUNTY 911  :
DISPATCHER JANE DOE,     :
PENNSYLVANIA STATE      :
POLICE DISPATCHER JANE   :
DOE, and COMMONWEALTH OF :
PENNSYLVANIA/PENNSYLVANIA:
STATE POLICE,           :
                                 :
       Defendants.    :

## COMPLAINT

Plaintiff, Edward Lee Bentler ("Mr. Bentler"), by and through his attorneys,

Barry H. Dyller, Theron J. Solomon, Chad J. Sweigart and Dyller & Solomon, LLC,

brings this action related to the deprivation of Mr. Bentler's federally-protected

rights and in support thereof, alleges as follows:

## JURISDICTION AND VENUE

1.    This action arises out of violations of the United States Constitution

brought pursuant to 42 U.S.C. § 1983, the Americans with Disabilities Act and the

Rehabilitation Act.

2.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 133 and 1343.

3.      Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## THE PARTIES

4.      Plaintiff Mr. Bentler is an adult individual domiciled in Susquehanna County, Pennsylvania.

5.      Defendant Nicholas Nederostek was at all times relevant hereto employed by the Commonwealth of Pennsylvania/Pennsylvania State Police as a Corporal.

6.      Defendant Daniel Nilon was at all times relevant hereto employed by the Commonwealth of Pennsylvania/Pennsylvania State Police as a Corporal.

7.      Defendant Gregory Yanochko was at all times relevant hereto employed by the Commonwealth of Pennsylvania/Pennsylvania State Police as a Trooper.

8.      Defendant Susquehanna County (the "County") is a municipality in Pennsylvania that operates the County's Public Safety/911 Department ("County 911").

9.     Defendant Susquehanna County 911 Dispatcher Jeff ("911 Dispatcher Jeff") was at all times relevant hereto employed by the County as a 911 dispatcher. 911 Dispatcher Jeff received a 911 call from Mr. Bentler on July 20, 2020 at or about 7:00 a.m.

10.    Defendant County 911 Dispatcher Jane Doe ("County 911 Dispatcher Jane Doe") was at all times relevant hereto employed by the County as a 911 dispatcher.  Defendant 911 Dispatcher Jane Doe telephoned Pennsylvania State Police Dispatcher Jane Doe after 911 Dispatcher Jane Doe's co-worker 911 Dispatcher Jeff received a 911 call from Mr. Bentler on July 20, 2020.

11.    Defendant Pennsylvania State Police Dispatcher Jane Doe ("PSP Dispatcher Jane Done") was at all times relevant hereto employed by the Commonwealth of Pennsylvania/Pennsylvania State Police as a dispatcher.

12.    Defendant Commonwealth of Pennsylvania/Pennsylvania State Police ("Pennsylvania State Police" or "PSP") is a state and department of a state.

## **FACTUAL BACKGROUND**

### The Events of July 19, 2020

13.     In the afternoon or evening on July 19, 2020, Mr. Bentler was in an altercation with a family acquaintance, Enos White, at Mr. White's home.

14.     Specifically, Mr. Bentler arrived at Mr. White's property in search of a crossbow that had been owned by Mr. Bentler's father prior to his passing and had at

one point been in the possession of Mr. White.

15.     Mr. White told Mr. Bentler that he did not have possession of the crossbow.

16.     An argument ensued, which resulted in Mr. White retrieving a rifle and pointing it at Mr. Bentler.

17.     A physical altercation followed, culminating in Mr. Bentler taking the rifle from Mr. White and leaving the property with the firearm.

18.     At the time, Mr. Bentler was suffering a mental breakdown.  He had prior diagnoses of bi-polar disorder, depression and post-traumatic stress disorder.

19.     Later that evening, Mr. Bentler retrieved a pick-up truck from his then-girlfriend's home, Dianna Renee Phillips.

20.     As a result of those events, Trooper Josh Oliver of the PSP obtained an arrest warrant for Mr. Bentler on the evening of July 19, 2020.

The 911 Call

21.     During the ensuing hours into the morning on July 20, 2020, Mr. Bentler proceeded in the pick-up truck towards the Pennsylvania Fish and Boat Commission Boat Launch off of Turkey Woods Road in Susquehanna County (the "boat launch").

22.     Mr. Bentler crashed the pick-up truck in a ditch at the boat launch.

23.     At shortly after 7:00 a.m., Mr. Bentler phoned County 911 for assistance, speaking with 911 Dispatcher Jeff.

24.     During the three minute and forty-three second 911 call between Mr. Bentler and 911 Dispatcher Jeff, Mr. Bentler conveyed all of the following: (1) "I need some medical help.  I'm mentally not stable."; (2) "I'm just not in the right state of mind.  I feel like hurting myself or someone else.  I just need help."; (3) "Please don't send people to excessive force me because I'm not in the right state of mind so I don't know what I'm capable of."; (4) "I need to go the hospital to get checked out."; (5) "I don't know.  I can't remember exactly what all happened yesterday but I just need I got to get help."; (6) "I haven't been in the right state of mind for a couple days now."; and (7) "No I'm not [in the right state of mind].  And I have a gun, I have a knife, I have. . . I don't know what the fuck I'm doing."

25.     The distress in Mr. Bentler's voice during this call was apparent, and Mr. Bentler is heard crying intermittently throughout the call.

26.     Before hanging up with Mr. Bentler, 911 Dispatcher Jeff stated "don't do anything to hurt yourself.  I'll get fire and EMS started."

<u>Susquehanna County 911's First Call to PSP</u>

27.     Following Mr. Bentler's call to 911, Susquehanna County Dispatchers contacted PSP.

28.     Specifically, County 911 Dispatcher Jane Done initiated a 911 call to

PSP Dispatcher Jane Done.

29.    In that call, County 911 Dispatcher Jane Doe told PSP Dispatcher Jane Doe that the call was for "a motor vehicle accident -- apparently it happened yesterday."

30.    Defendant County 911 Dispatcher Jane Doe also advised PSP Dispatcher Jane Doe that the caller was Mr. Bentler and "he has been there since yesterday."

31.    PSP Dispatcher Jane Doe asked Defendant County 911 Dispatcher Jane Doe "what did [Mr. Bentler] say?"

32.    Following a pause and in response to PSP Dispatcher Jane Doe's question "what did this guy tell you," 911 Dispatcher Jeff got on the line and relayed that "so he went into a ditch yesterday -- totaled the vehicle.  Does have a knife there with him."

33.    911 Dispatcher Jeff went on to say that Mr. Bentler stated that "he was out of his mind and doesn't know what happened."

34.    911 Dispatcher Jeff further informed PSP Dispatcher Jane Doe that he is "still in the car.  Still in the ditch.  Should be right at the boat launch.  He said he's not in the right state of mind."

35.    Lastly, 911 Dispatcher Jeff instructed PSP Dispatcher Jane Doe "to be advised that he did say something about a knife being in the truck."

36.    In the initial call to PSP, Susquehanna County 911 never

communicated that Mr. Bentler had a firearm, despite him clearly telling 911 that he possessed one during the call, nor did County dispatchers emphasize the obvious mental instability reflected in Mr. Bentler's words and actions while on the call.

Susquehanna County 911's Second Call to PSP

37.     PSP Dispatcher Jane Doe received a subsequent call from Susquehanna County 911 after Hallstead Fire Chief Robert Thatcher ("Chief Thatcher") arrived at the boat launch, observed Mr. Bentler with a rifle, and advised County 911 that Mr. Bentler was in the possession of a firearm.

38.     PSP Dispatcher Jane Doe asked the County 911 employee what kind of vehicle Mr. Bentler had.

39.     Despite Mr. Bentler having previously advised Susquehanna County 911 that he was in a pick-up truck, the Susquehanna County employee advised the PSP dispatcher that she did not know what kind of vehicle Mr. Bentler had been driving.

The SERT Team is Not Called

40.     The Special Emergency Response Team (SERT) is a specialized unit in the PSP that is comprised of officers and troopers that are specifically trained in tactical and negotiation responses.

41.     The SERT Team was available to be summoned by PSP on July 20, 2020 to the boat launch.

42.     Neither Corporal Nederostek, Trooper Smith nor Trooper Yanochko

called for the SERT team to respond to the boat launch.

Chief Thatcher Arrives at the Boat Launch

43.     Chief Thatcher was first to arrive at the boat launch.

44.     According to Chief Thatcher, he was dispatched to the boat launch for a one car motor vehicle accident into a ditch.

45.     Susquehanna County 911 never told Chief Thatcher that Mr. Bentler had a weapon.

46.     Chief Thatcher exited his vehicle and approached Mr. Bentler who was seated hunched over next to the pick-up truck.

47.     After asking Mr. Bentler if he was alright, Mr. Bentler sat up and had a rifle resting in his lap.

48.     Chief Thatcher backed away from Mr. Bentler, returned to his vehicle and backed his truck out of the scene.

49.     Chief Thatcher then contacted Susquehanna County 911 and stated that Mr. Bentler had a firearm and to expedite PSP's response.

PSP Arrives at the Boat Launch

50.     The first PSP employee to arrive at the boat launch was Trooper Taylor Smith.

51.     Trooper Smith arrived less than two minutes before the next PSP officers.

52.     Trooper Smith exited his vehicle, pulled out his pistol and verbally

engaged Mr. Bentler, specifically directing Mr. Bentler to show his hands.  Mr. Bentler did not comply.

53.     Mr. Bentler eventually responded to Trooper Smith that he called for help and not to be harassed.

54.     Trooper Smith then observed a rifle in Mr. Bentler's possession.

55.     Trooper Smith directed Mr. Bentler to put the gun down, but Mr. Bentler refused, stating that he would put his gun down if Trooper Smith did the same with his firearm.

56.     Trooper Smith repeated his command to Mr. Bentler several more times to put the gun down.

57.     Trooper Smith's commands and tone for Mr. Bentler to drop his firearm became increasingly more aggressive and hostile the longer Mr. Bentler held the rifle.

58.     During the time he was alone with Mr. Bentler, Mr. Bentler did not threaten nor attempt to threaten or assault Trooper Smith in any way.

59.     Approximately one minute and thirty seconds after Trooper Smith arrived on the scene and exited his vehicle, Trooper Yanochko and Corporal Nederostek arrived at the boat launch in separate vehicles (with Corporal Nederostek arriving first).

60.     Fifteen seconds later, about one minute and forty-five seconds after Trooper Smith got to the boat launch, Corporal Nederostek assumed responsibility

for shouting verbal commands at Mr. Bentler to drop his firearm.

61.     At this point, Trooper Smith proceeded to the trunk of his vehicle to obtain his rifle.

Corporal Nederostek Shoots Mr. Bentler

62.     Corporal Nederostek directed Mr. Bentler to put the rifle down five or six times within twenty-six seconds of assuming responsibility for shouting commands at Mr. Bentler.

63.     Specifically, after Corporal Nederostek's first two commands to lower the rifle, Mr. Bentler responded that he "asked for help," to which Corporal Nederostek replied "put the rifle down, Eddie."

64.     At this point, Mr. Bentler was holding the scoped rifle in his right hand with it pointed at the ground, while in his left hand he was holding a cigarette.

65.     Mr. Bentler stated "I need help man" to Corporal Nederostek.

66.     The following exchange then occurred:

> Corporal Nedorstek: Alright well you need to put the rifle down.
>
> Mr. Bentler: You put yours down.
>
> Corporal Nederostek: Doesn't work like that Eddie, come on.

67.     Directly after that exchange, Mr. Bentler, **with his rifle pointed at the ground**, took a step out from the side of the disabled pick-up truck and Corporal Nederostek immediately fired three shots at Mr. Bentler.

68.      Mr. Bentler never raised his firearm.

69.     Mr. Bentler never pointed his rifle at Corporal Nederostek or anyone else.

70.     Mr. Bentler never leveled the rifle at Corporal Nederostek, Trooper Smith, Trooper Yanochko or anyone else.

71.     Corporal Nederostek's discharge of his firearm occurred within thirty seconds after he shouted his first command at Mr. Bentler and within forty-five seconds of his arrival at the boat launch.

72.     In a post-use of force interview of Corporal Nederostek, he explained that he "feared that [Mr. Bentler] was going to start shooting at us *or at least aim his rifle towards us* and so I fired my rifle three times and he went down."

73.     Corporal Nederostek's discharge of his firearm was a preemptive shooting.

74.     Corporal Nederostek's shooting of Mr. Bentler is captured (with audio) on the Mobile Video Recording (MVR) for his vehicle.

75.     This MVR conclusively shows that Mr. Bentler did not aim or point his rifle at any of the responding PSP employees at the boat launch prior to the use of lethal force against him.

76.     Audio of the events at the boat launch was also captured on the MVR of Trooper Smith's vehicle.   Because the MVR for Trooper Smith's vehicle was not facing Mr. Bentler and the pick-up truck, video of the shooting was not captured on Trooper Smith's MVR.

11

## CRIMINAL PROSECUTION FOR THE EVENTS AT THE BOAT LAUNCH

Criminal Complaint and Affidavit of Probable Cause

77.     Following the events at the boat launch, but still on July 20, 2020,

Defendant Corporal Daniel Nilon filed a criminal complaint against Mr. Bentler.

78.     The July 20, 2020 criminal complaint contained the following charges:

(1) three counts of attempted murder of a law enforcement officer of the first degree

in violation of 18 Pa. C.S.A. § 2507(a); (2) four counts of aggravated assault in

violation of 18 Pa. C.S.A. § 2702(a)(2); (3) one count of receiving stolen property

(the rife) in violation of 18 Pa. C.S.A. § 3925(a); (4) one count of receiving stolen

property (the pick-up truck) in violation of 18 Pa. C.S.A. § 3925(a); (5) one count of

person not to possess a firearm in violation of 18 Pa. C.S.A. § 6105(a)(1); (6) four

counts of terroristic threats in violation of 18 Pa. C.S.A. § 2706(a)(1); (7) four

counts of simple assault in violation of 18 Pa. C.S.A. § 2701(a)(1); and (8) four

counts of recklessly endangering another person in violation of 18 Pa. C.S.A. §

2705.

79.     In the affidavit of probable cause prepared by Corporal Nilon in

support of the criminal charges against Mr. Bentler, Corporal Nilon swore to, *inter

alia*, the following facts: (1) Mr. Bentler "rais[ed] the rifle off his lap, showing it to

Chief Thatcher"; (2) "Tprs 1 & 2 immediately observed the male to be standing

behind the rear driver's corner of the pickup holding the rifle, ***pointing it in the

direction of the troopers***"; and (3) "Bentler continued to hold the rifle and ***point it in***

*the direction of the troopers and Hallstead Fire Department members*."

80.     Chief Thatcher's testimony, the MVR and Corporal Nilon's own testimony show that these allegations, from day one, were false and had no foundation in fact.

81.     These false, sworn allegations were made for the sole purpose of maliciously prosecuting Mr. Bentler with attempted murder of the PSP officers.

The Preliminary Hearing

82.     A preliminary hearing was held on the criminal charges related to the events at the boat launch on August 10, 2020 before Magisterial District Judge Jodi L. Cordner.

83.     The Commonwealth, represented by Susquehanna County District Attorney Marion O'Malley ("DA O'Malley"), called two witnesses at the preliminary hearing: Corporal Nilon and Trooper Smith.

84.     On cross-examination at the preliminary hearing, in response to the question of whether "Mr. Bentler point[ed] the firearm at anyone in that video," Corporal Nilon testified that "[i]t's not pointed, no."

85.     Corporal Nilon also answered "correct" to the question "[s]o he didn't point the gun at anybody?"

86.     Trooper Smith similarly testified at the preliminary hearing that Mr. Bentler never pointed the firearm at him or anyone else to his knowledge.

87.     Besides the receipt of stolen property charge relating to the pick-up

truck which was withdrawn by the Commonwealth, all charges against Mr. Bentler were bound over to the Court of Common Pleas of Susquehanna County (the "Trial Court").

88.     Trial was ultimately scheduled to commence on July 13, 2021.

The Amended Information

89.     On July 12, 2021, the day before trial was set to commence, DA O'Malley filed an amended information against Mr. Bentler.

90.     The amended information modified the aggravated assault charges from the initially charged violation of 18 Pa. C.S.A. § 2702(a)(2) to a violation of subsection (a)(6), and the simple assault charges from the initially charged violation of 18 Pa. C.S.A. § 2701(a)(1) to a violation of subsection (a)(3).  Otherwise, the amended information was consistent with the charges bound over to the Trial Court.

The Criminal Trial Testimony

91.     Mr. Bentler's criminal trial began on July 13, 2021 and ended on July 14, 2021.

92.     Among other witnesses, Chief Thatcher, Troopers Smith and Yanochko and Corporals Nederostek and Nilon testified at the criminal trial.

93.     Chief Thatcher testified that Mr. Bentler did not do anything with the rifle, including that he did not aim, shoulder or point the rifle at Chief Thatcher.

94.     Rather, all Chief Thatcher saw was Mr. Bentler "just lean[ ] back and I saw the rifle laying on his -- flat."

95.     Trooper Yanochko testified at the criminal trial that Mr. Bentler held the rifle in the "general direction" of the troopers and "in a split second" Mr. Bentler **could have** picked the rifle up and aimed it.

96.     This "general direction" was while Mr. Bentler stood behind the truck according to Trooper Yanochko

97.     Trooper Yanochko agreed that the rifle was never shouldered or aimed at him.

98.     Instead, Trooper Yanochko said that "[t]here was possibly a raising of the hands" by Mr. Bentler which he "could kind of observe" after his review of the MVR.

99.     When Trooper Yanochko was specifically asked whether his "testimony [was] that he raised the gun up," Trooper Yanochko answered: "I didn't say he raised it" and that "[m]y testimony was that he made a motion that could appear that he was raising the weapon."

100.     Trooper Yanochko's recount of the events at the boat launch is belied by the MVR to Corporal Nederostek's vehicle.

101.     Trooper Smith also testified at the criminal trial.

102.     According to Trooper Smith, Mr. Bentler never pointed, aimed and/or leveled the rifle at him.

103.     During Corporal Nilon's trial testimony, he answered "correct" to the following question: "In you're [sic] objective view of the video and any other video

you reviewed, Mr. Bentler doesn't point the gun at anyone.  Correct?"

104.    Despite the video evidence that Mr. Bentler never pointed or even raised his gun, Corporal Nederostek testified that Mr. Bentler "stepped away from [the truck] and began to turn towards me and opened himself up and at that moment, I felt 100 percent certain that he was going to start shooting at us and there was no other choice and I had to shoot."

105.    Corporal Nederostek fired three shots because of "the stress, the adrenaline."

106.    Corporal Nederostek agreed that Mr. Bentler never shouldered the rifle, never raised the rifle and looked out of the scope on the rifle, and he never steadied the rifle to take a shot.

107.    According to Corporal Nederostek, Mr. Bentler's rifle was angled down at the time he discharged his firearm.

108.    Corporal Nederostek testified that at the time Mr. Bentler stepped out from the side of the pick-up truck, Mr. Bentler **could have** raised the firearm up or he could have thrown the rifle down.

109.    The MVR from Corporal Nedorstek's vehicle conclusively proves that Mr. Bentler never raised and/or pointed the rifle at anyone.

The Criminal Trial Outcome

110.    At the close of the evidence in Mr. Bentler's criminal trial, his trial counsel moved for a judgment of acquittal.

16

111.    The Trial Court granted a judgment of acquittal on the following charges: (1) three counts of attempted homicide of a law enforcement officer; (2) one count of receiving stolen property; (3) one count of terroristic threats as against Chief Thatcher; (4) four counts of recklessly endangering another person; (5) one count of aggravated assault as against Chief Thatcher; and (6) one count of simple assault as against Chief Thatcher.

112.    Mr. Bentler was found guilty on the remaining ten counts of the amended information, namely, one count of possession of a firearm prohibited, three counts of terroristic threats as against the PSP officers, three counts of aggravated assault as against the PSP officers, and three counts of simple assault as to the PSP officers.

Sentencing and Appeal

113.    On November 24, 2021, the Trial Court sentenced Mr. Bentler to an aggregate period of incarceration on all counts of five to twenty years in a state correctional facility.

114.    On December 3, 2021, Mr. Bentler timely filed a post-sentence motion for judgment of acquittal.

115.    The Trial Court denied Mr. Bentler's post-sentence motion on March 9, 2022.

116.    Mr. Bentler filed a notice of appeal with the Pennsylvania Superior Court on April 8, 2022 appealing the Trial Court's judgment of sentence entered

July 14, 2021 and the Trial Court's denial of the post-trial motions on March 9, 2022.

117.    Mr. Bentler's criminal appeal remains pending before the Pennsylvania Superior Court.

Mr. Bentler's Injuries

118.    Mr. Bentler sustained substantial physical and emotional injuries as a result of being shot on July 20, 2020.

119.    After being shot, Mr. Bentler underwent multiple surgeries to repair his left arm.

120.    Mr. Bentler suffered substantial physical pain as a result of being shot.

121.    Mr. Bentler suffered and continues to suffer substantial emotional pain as a result of being permanently disabled by being shot.

122.    Mr. Bentler has limited use of his left arm, and his left arm may need to be amputated in the future.

123.    Mr. Bentler therefore suffered serious, life-altering injuries as a result of the unwarranted use of lethal force against him.

COUNT ONE
Excessive Force
Mr. Bentler v. Defendant Nederostek
(42 U.S.C. § 1983)

124.    Mr. Bentler repeats and realleges each and every allegation contained above as if fully repeated herein.

125.    Corporal Nederostek's use of force set forth above constituted an unreasonable seizure under the Fourth Amendment to the United States Constitution.

126.    Based on the facts as alleged herein and the MVR of the incident, it was objectively unreasonable, in light of the totality of the circumstances, for Corporal Nederostek to use lethal/deadly force against Mr. Bentler.

127.    Mr. Bentler did not raise, shoulder, point or make any movements with the firearm to justify Corporal Nederostek's discharge of his firearm.

128.    Corporal Nederostek's conduct was therefore a deprivation, under color of state law, of rights guaranteed to Mr. Bentler under the Fourth Amendment and Fourteenth Amendment to the United States Constitution.

129.    As a result of Corporal Nederostek's violations of Mr. Bentler's constitutional rights, Mr. Bentler suffered substantial injuries and damages.

<u>COUNT TWO</u>
Malicious Prosecution
Mr. Bentler v. Defendants Nilon & Yanochek
(42 U.S.C. § 1983)

130.    Mr. Bentler repeats and realleges each and every allegation contained above as if fully repeated herein.

131.    Corporal Nilon caused criminal proceedings to be initiated against Mr. Bentler, resulting in Mr. Bentler's arrest and prosecution, and conspired with Trooper Yanochko to proceed against Mr. Bentler with three counts of attempted first degree murder of a law enforcement officer.

132.    The attempted murder charge lacked any basis in fact and was without probable cause.

133.    An objective review of the MVR demonstrates that Mr. Bentler did not engage in a substantial step toward the commission of an attempted first-degree murder of a law enforcement officer as required to sustain such a charge.

134.    A judgment of acquittal was entered in favor of Mr. Bentler on the attempted first-degree murder of a law enforcement officer charges.

135.    Corporal Nilon with the assistance of Trooper Yanochko brought the attempted first-degree murder of a law enforcement officer charges with malice or for a purpose other than bringing the plaintiff to justice.

136.    While not all criminal charges terminated in Mr. Bentler's favor at present (although the charges with which he was convicted are on appeal before the Superior Court), Mr. Bentler was clearly innocent of the attempted murder charges.

137.    As the MVR reflects, Mr. Bentler did not take any step -- let alone a substantial one -- in an attempt to murder a law enforcement official.

138.    Despite this and Corporal Nilon's admission that review of the video confirmed that Mr. Bentler never pointed the firearm at any law enforcement officer, Corporal Nilon initiated the attempted first-degree homicide of a law enforcement officer charges and falsely stated in the affidavit of probable cause that Mr. Bentler pointed the firearm at law enforcement officials.

139.    Trooper Yanochko also provided false information with respect to the

attempted first-degree murder of a law enforcement officer charges against Mr. Bentler in that Trooper Yanochko is the only one of the three PSP employees at the boat launch who stated (in his post-incident interview, trial testimony or otherwise) that Mr. Bentler pointed the rifle at the officers.

140.    But, as the MVR from Corporal Nederostek's vehicle reveals, Mr. Bentler never pointed his firearm at the officers.

141.    Given that Trooper Yanochko arrived at the boat launch after Corporal Nederostek, all of the events at the boat launch that occurred in Trooper Yanochko's presence are captured on the MVR.

142.    Because the MVR conclusively establishes that Mr. Bentler never pointed his firearm at the officers, Trooper Yanochko's statements and testimony to the contrary were completely fabricated.

143.    Defendants' initiation of these criminal charges against Mr. Bentler proximately caused damaged to Mr. Bentler.

144.    Mr. Bentler was physically seized by Corporal Nilon and Trooper Yanochko as a result of the charges.

145.    Therefore, Corporal Nilon's and Trooper Yanochko's conduct was a deprivation, under color of state law, of rights guaranteed to Mr. Bentler under the Fourth and Fourteenth Amendments to the United States Constitution.

146.    As a result of Corporal Nilon's and Trooper Yanochko's violations of Mr. Bentler's constitutional rights, Mr. Bentler suffered substantial injuries and

damage.

COUNT THREE

Substantive Due Process

Mr. Bentler v. Susquehanna County, 911 Dispatcher Jeff, 911 Dispatcher Jane Doe
& PSP Dispatcher Jane Doe

(42 U.S.C. § 1983)

147.    Mr. Bentler repeats and realleges each and every allegation contained above as if fully repeated herein.

148.    The County, 911 Dispatcher Jeff and 911 Dispatcher Jane Doe (collectively, "County Defendants") and PSP Dispatcher Jane Doe assumed a duty to keep Mr. Bentler safe when they affirmatively placed Mr. Bentler in a position of danger that he would not have otherwise faced.

149.    Specifically, on the morning of July 20, 2020, Mr. Bentler contacted Susquehanna County 911 and reported that he was mentally unstable, had a gun and needed help.

150.    911 Dispatcher Jeff reassured Mr. Bentler that he would get EMS on its way to assist him.

151.    Instead, rather than report Mr. Bentler's situation at the boat launch as presented as a mentally disturbed man with a firearm, the County, 911 Dispatcher Jeff and 911 Dispatcher Jane Doe affirmatively contacted PSP and reported a "motor vehicle accident" at the boat launch.

152.    County Defendants advised PSP Dispatcher Jane Doe that Mr. Bentler

totaled his vehicle and had a knife there with him.

153.    The harm suffered by Mr. Bentler was a foreseeable and fairly direct consequence of County Defendants ignoring/minimizing Mr. Bentler's mental instability and his panicked cry for help.

154.    County Defendants' report to PSP with respect to Mr. Bentler's 911 call relayed only that Mr. Bentler was in a motor vehicle accident, that he had a knife, and he did not recall what happens.

155.    County Defendants' conduct in this regard was conscious shocking as 911 Dispatcher Jeff reassured Mr. Bentler that he would get help, knew Mr. Bentler stated that he was not sure what he was capable of and that he had a gun, but, despite this, County Defendants intentionally and/or with disregard to a great risk of harm, downplayed the gravity of Mr. Bentler's situation and likened it to a run-of-the-mill disabled vehicle incident.

156.    Mr. Bentler was a foreseeable victim of County Defendants' actions, as they were dispatching emergency officials to a 911 call placed by Mr. Bentler concerning a mental health episode involving Mr. Bentler, but the serious mental health concerns conveyed by Mr. Bentler were not initially relayed to the responding officers.

157.    County Defendants affirmatively exercised their authority to create a danger and/or make Mr. Bentler more vulnerable to danger than had they not acted at all.

158.     911 Dispatchers Jeff and Jane Doe by relaying to PSP that Mr. Bentler was in a motor vehicle accident without emphasizing the attendant conditions concerning Mr. Bentler's mental issues, potential suicidality, possession of a firearm and overall emotional state made Mr. Bentler more vulnerable to harm.

159.     Further, based on information and belief, and consistent with County Defendants' cavalier treatment of Mr. Bentler's stated mental health concerns, the County had policies, practices and/or customs related to the failure to train its dispatchers on handling 911 calls from mentally unstable callers.

160.     The County also had a policy, practice or custom of having its 911 dispatchers convey as minimal information as possible to emergency responders, including information regarding the callers' mental and emotional state.

161.     As a result of the County's, 911 Dispatcher Jeff's, 911 Dispatcher Jane Doe's and PSP Dispatcher Jane Doe's violations of Mr. Bentler's constitutional rights, Mr. Bentler suffered substantial injuries and damage.

COUNT FOUR
Mr. Bentler v. the County &
Commonwealth of Pennsylvania/Pennsylvania State Police
(Americans with Disabilities Act)

162.     Mr. Bentler repeats and realleges each and every allegation contained above as if fully repeated herein.

163.     Mr. Bentler was disabled within the meaning of the Americans with Disabilities Act as he was mentally unstable and had previous diagnoses of bi-polar

disorder, depression and post-traumatic stress disorder.

164.    Prior to the events at the boat launch, all Defendants were aware of Mr. Bentler's mental state given his reports to Susquehanna County 911, the fact that a warrant was out for Mr. Bentler's arrest from the prior evening that was allegedly predicated on drug-seeking behavior and/or mental instability, and/or Mr. Bentler's prior involvement with the legal system for mental health related issues.

165.    Mr. Bentler's mental instability was specifically known by Trooper Yanochko prior to his arrival at the boat launch based on his prior involvement in 2017 with a 302 commitment of Mr. Bentler.

166.    Corporal Nederostek was likewise aware of Mr. Bentler's mental instability given his knowledge that Mr. Bentler "wasn't in a good place and that he needed help."

167.    Rather than provide help, though, Corporal Nederostek engaged Mr. Bentler in a manner contradictory to PSP's purported de-escalation policies and practices.

168.    Similarly, prior to Trooper Smith's arrival at the boat launch, he knew Mr. Bentler was "acting strange."

169.    The County and the Commonwealth of Pennsylvania/PSP's knowledge of Mr. Bentler's mental health condition predated the use of excess force described above.

170.    Reasonable accommodations for individuals to be taken into custody

with mental disabilities and mental health conditions include, but are not limited to, employing the passage of time to advantage, using non-threatening communication, respecting the individual's comfort zone and not unreasonably agitating or exciting the individual and instead calming the situation.

171.   Instead of making these accommodations, PSP officers escalated the situation, used aggressive and threatening communication and failed to follow basic Commonwealth of Pennsylvania/PSP policy with respect to dealing with individuals with mental health conditions and/or disabilities.

172.   Despite knowing of the obvious risk that its troopers may discriminate on the basis of disability and/or fail to make reasonable accommodations when arresting individuals with mental health conditions, the Commonwealth of Pennsylvania/PSP chose not to provide its troopers with specialized training for interacting with individuals with mental health conditions.

173.   Based on information and belief, neither Troopers Smith and Yanochko nor Corporal Nederostek had any specialized training with respect to individuals with mental health conditions or deescalating situations involving mentally unstable individuals and/or suspects.  Rather, Troopers Smith and Yanochko and Corporal Nederostek's training did not specifically address interacting with mentally unstable individuals.

174.   Defendant Commonwealth of Pennsylvania/PSP therefore acted with deliberate indifference by failing to properly train troopers to have peaceful

encounters with mentally unstable persons and by failing to establish adequate policies for handling such encounters.

175.   Commonwealth of Pennsylvania/PSP further acted with deliberate indifference by failing to modify policy and practices to reasonably accommodate individuals with mental health issues and mental instability pursuant to the ADA.

176.   Further, to the extent that the Commonwealth of Pennsylvania/PSP had policies and provided troopers training regarding deescalating situations involving mentally unstable individuals, Troopers Smith and Yanochko and Corporal Nederostek failed to follow those policies and trainings.

177.   Specifically, Troopers Smith and Yanochko and Corporal Nederostek failed to engage in any practical de-escalation tactics, including strategically approaching the scene in a manner that would have allowed for collecting additional intelligence and using minimal physical and psychological pressure to be placed on Mr. Bentler.

178.   Troopers Smith and Yanochko and Corporal Nederostek further failed to practice the basic components of crisis communication when they confronted Mr. Bentler.

179.   Troopers Smith and Corporal Nederostek utilized repetitive commands despite the fact doing so is not an effective de-escalation tactic.

180.   Troopers Smith and Yanochko and Corporal Nederostek failed to employ active listening skills to deescalate the incident at the boat launch.

181.   Troopers Smith and Yanochko and Corporal Nederostek failed to retain emotional control at the boat launch which therefore led to the unnecessary escalation of the situation.

182.   Moreover, Troopers Smith and Yanochko and Corporal Nederostek failed to utilize any strategies for "[d]ealing with emotionally or mentally stressed subjects" in that they jumped to conclusions, did not focus on the resolution, did not gather information from all available sources, and did not explain that they were there to help or even attempt to build a rapport with Mr. Bentler.

183.   Troopers Smith and Yanochko and Corporal Nederostek did not utilize any methods to deescalate the situation with Mr. Bentler and instead approached the incident counter to all methods of de-escalation and dealing with emotionally or mentally stressed subjects.

184.   Mr. Bentler's rights were further violated by the Commonwealth of Pennsylvania/PSP based on the failure to deploy the SERT team despite the appropriateness of such a response under the circumstances.

185.   Deployment of the SERT Team, based on information and belief, was compelled under PSP's purported policies and practices based on the events and circumstances as presented at the boat launch.

186.   The County acted with deliberate indifference by failing to properly train its dispatchers on responding to situations involving mentally unstable and/or mentally disabled callers.

187.    The County's failures included, *inter alia*, failing to adequately train dispatchers to prioritize, identify and convey information regarding a caller's mental disturbance or instability.

188.    The County acted with deliberate indifference by failing to modify policy and practices to reasonably accommodate individuals with mental health issues and mental instability pursuant to the ADA.

189.    Mr. Bentler's rights were also violated by the County based on its dispatcher's deployment of responders for a disabled vehicle while simultaneously ignoring and disregarding that Mr. Bentler's 911 call was predicated on his mental instability and plea for emergency mental health assistance.

190.    Under the ADA, the County and Commonwealth of Pennsylvania/PSP are vicariously liable for the acts of their employees.

191.    The County and Commonwealth of Pennsylvania/PSP therefore acted with deliberate indifference to Mr. Bentler.

192.    As a result of the County's and Commonwealth of Pennsylvania/PSP's violation of the Americans with Disabilities Act, Mr. Bentler suffered substantial injuries and damage.

<u>COUNT FIVE</u>
Mr. Bentler v. the County &
Commonwealth of Pennsylvania/Pennsylvania State Police
(Rehabilitation Act)

193.    Mr. Bentler repeats and realleges each and every allegation made above

as if fully repeated herein.

194.   The County and Commonwealth of Pennsylvania/PSP are entities that receive federal funding.

195.   The County's and Commonwealth of Pennsylvania/PSP's actions and inactions as described above violated the Rehabilitation Act.

196.   As a result of the County's and Commonwealth of Pennsylvania/PSP's violations of the Rehabilitation Act, Mr. Bentler suffered substantial injuries and harm.

WHEREFORE, Mr. Bentler demands judgment as follows:

A. As to Defendants the County and Commonwealth of Pennsylvania/PSP, an amount to be determined at trial plus interest;

B. As to individual Defendants, an amount to be determined at trial, including punitive damages against each of them, plus interest;

C. For plaintiffs' attorneys' fees, pursuant to 42 U.S.C. § 1988;

D. For the costs and disbursements incurred in this action; and

E. For such other and further relief as the Court deems just and proper.

DYLLER & SOLOMON, LLC

/s/ Barry H. Dyller
/s/ Theron J. Solomon
/s/ Chad J. Sweigart
Attorneys   for   Plaintiff
Gettysburg House

88  North  Franklin  Street
Wilkes-Barre, PA  18701
(570) 829-4860

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: <u>July 15, 2022</u>