## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| | : | |
| **EDWARD BENTLER,** | : | |
| | : | **CIVIL ACTION NO. 3:22-1107** |
| **Plaintiff** | : | |
| | : | **(JUDGE MANNION)** |
| **v.** | : | |
| | : | |
| **NICHOLAS NEDEROSTEK,** *et al.,* | : | |
| | : | |
| **Defendants** | : | |
| | : | |

## <u>MEMORANDUM</u>

Before the court are two motions to dismiss Plaintiff Edward Bentler's complaint, (Doc. 1), one filed by Susquehanna County, Susquehanna County 911 Dispatcher Jeff, and Susquehanna County 911 Dispatcher Jane Doe (the "County Defendants"), (Doc. 12), and the other filed by Corporal Nicholas Nederostek, Corporal Daniel Nilon, Trooper Gregor Yanochko, and the Pennsylvania State Police (the "PSP Defendants"), (Doc. 13). Bentler brings this lawsuit against the above state actors for violation of his constitutional rights arising from a tragic incident in which Bentler was apparently in the throes of a mental breakdown when, after failing to comply with multiple commands from police to drop his rifle, he was shot multiple times, sustaining injuries.

County Defendants seek dismissal of all claims against them related to their alleged failure to communicate the salient facts of Bentler's condition when dispatching emergency personnel to the scene of the incident. As explained below, Bentler does not state a cognizable due process claim against the County Defendants, but he does state cognizable claims under the Americans with Disabilities Act (ADA) and Rehabilitation Act (RA); thus, County Defendants' motion to dismiss will be **GRANTED in part and DENIED in part**.

PSP Defendants seek dismissal of all claims against them, except Bentler's excessive force claim, related to their forcible response to the tense scene ending in Bentler receiving three bullets as well as Bentler's subsequent criminal prosecution. As a matter of law, Bentler cannot presently bring a malicious prosecution claim for his prosecution and acquittal for attempted murder of a police officer because he was convicted of related offenses. However, Bentler has stated cognizable claims under the ADA and RA against PSP; thus, the PSP Defendants' motion to dismiss will also be **GRANTED in part and DENIED in part**.

In sum, Bentler's excessive force claim (Count I), ADA claim (Count III), and RA claim (Count IV) will proceed; the remaining claims will be **DISMISSED without prejudice**.

# I.   BACKGROUND

The background of this case is taken from the factual allegations set forth in Bentler's complaint, (Doc. 1), which the court must accept as true for purposes of the defendants' motions to dismiss.

## A. Bentler crashes at the boat launch

On July 19, 2020, Bentler was in an altercation with a family acquaintance. The family acquaintance retrieved a rifle and pointed it at Bentler; then Bentler took the rifle and left the property. Bentler proceeded to retrieve a pick-up truck from his former girlfriend's home. As a result of those events, Pennsylvania State Police obtained an arrest warrant for Bentler on that evening. In the early morning hours of July 20, 2020, Bentler crashed the pick-up truck in a ditch at the Boat Commission Boat Launch off of Turkey Woods Road in Susquehanna County.

## B. Bentler speaks with the County Dispatchers

Bentler called 911 and spoke with Susquehanna County 911 Dispatcher Jeff. The call lasted almost four minutes, during which Bentler conveyed at least seven times to Dispatcher Jeff that he was having a mental health breakdown. Bentler pleaded with 911 Dispatcher Jeff to not "send people to excessive force me." Bentler advised, "I have a gun, I have a knife . . . . ."

County 911 Dispatcher Jane Doe then contacted PSP Dispatcher Jane Doe to report a call for "a motor vehicle accident—apparently it happened yesterday." Dispatcher Jeff then got on the line and relayed: "so he went into a ditch yesterday—totaled the vehicle. Does have a knife there with him." Dispatcher Jeff also informed PSP Dispatcher Jane Doe that Plaintiff was "still in the car. Still in the ditch. Should be right at the boat launch. He said he's not in the right state of mind." Dispatcher Jeff continued, "[B]e advised that he did say something about a knife being in the truck."

PSP Dispatcher Jane Doe received a subsequent call from Susquehanna County 911 after Hallstead Fire Chief Robert Thatcher ("Chief Thatcher") arrived at the boat launch, observed Bentler with a rifle, and advised Susquehanna County 911 that Bentler was in possession of a firearm.

### C. PSP arrives on the scene; Bentler shot

Trooper Smith arrived as the first PSP employee at the boat launch. Trooper Smith verbally engaged with Bentler and began to "specifically direct" Bentler to show his hands. Bentler did not comply. Trooper Smith then observed the firearm in Bentler's possession. Trooper Smith ordered Bentler to put the firearm down; Bentler did not comply. Trooper Smith repeated his

- 4 -

order to put the firearm down several more times to Bentler; Bentler did not comply with any of these orders.

Approximately one minute and thirty seconds after Trooper Smith arrived on the scene and exited his vehicle, Trooper Yanochko and Corporal Nederostek arrived at the boat launch in separate vehicles (with Corporal Nederostek arriving first). Fifteen seconds later, roughly one minute and forty-five seconds after Trooper Smith got to the boat launch, Corporal Nederostek assumed responsibility for shouting verbal commands at Bentler. After Corporal Nederostek's first two commands to lower the rifle, Bentler responded that he "asked for help," to which Corporal Nederostek replied, "put the rifle down, Eddie." At this point, Bentler was holding the scoped rifle in his right hand with it pointed at the ground, while in his left hand he was holding a cigarette. Bentler stated, "I need help man." Corporal Nederostek responded, "Alright well you need to put the rifle down." Bentler said, "You put yours down." Corporal Nederostek responded, "Doesn't work like that Eddie, come on."

Next, with his rifle pointed at the ground, Bentler took a step out from the side of the disabled pick-up truck and Corporal Nederostek immediately fired three shots at Bentler, injuring him. This occurred within thirty seconds of Corporal Nederostek shouting his first command at Bentler.

### D. Bentler criminally prosecuted

Corporal Nilon filed a criminal complaint against Bentler related to the events at the boat launch the same day, *i.e.*, July 20, 2020, charging Bentler with a host of offenses. In the affidavit of probable cause to support those charges, Corporal Nilon represented: (1) Bentler "rais[ed] the rifle off his lap, showing it to" the fire chief; (2) "Tprs 1 & 2 immediately observed the male to be standing behind the rear driver's corner of the pickup holding the rifle, pointing it in the direction of the troopers"; and (3) "Bentler continued to hold the rifle and point it in the direction of the troopers and Hallstead Fire Department members." Bentler alleges these facts were false from day one and made solely for the purpose of maliciously prosecuting him with attempted murder of the PSP officers.

Bentler went to trial on several charges. At the close of the evidence, Bentler moved for a judgment of acquittal which was granted for the following charges: (1) three counts of attempted homicide of a law enforcement officer; (2) one count of receiving stolen property; (3) one count of terroristic threats as against the fire chief; (4) four counts of recklessly endangering another person; (5) one count of aggravated assault as against the fire chief; and (6) one count of simple assault as against the fire chief. Bentler's motion for judgment of acquittal was denied as to the remaining charges and he was

found guilty of the remaining ten counts, namely, one count of possession of a firearm prohibited, three counts of terroristic threats as against the PSP officers, three counts of aggravated assault as against the PSP officers, and three counts of simple assault as to the PSP officers. Following the trial court's denial of Bentler's post-trial motion, Bentler appealed to the Pennsylvania Superior Court; the appeal remains pending.

Bentler brings the following claims arising out of the foregoing events: excessive force against Corporal Nederostek (Count One); malicious prosecution against Corporal Nilon and Trooper Yanochko (Count Two); violation of substantive due process against the County Defendants and PSP Dispatcher Jane Doe (Count Three); violation of the ADA against the County and PSP (Count Four); and violation of the RA against the County and PSP (Count Five). Defendants seek dismissal of all claims, except excessive force, for failure to state a claim upon which relief can be granted.

## II.   STANDARD OF REVIEW

The defendants' motions to dismiss are brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Rule 12(b)(6) provides for the dismissal of a complaint, in whole or in part, if the complaint fails to state a claim upon which relief can be granted. The moving party bears the burden

of showing that no claim has been stated, *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005). Dismissal is appropriate only if, accepting all the facts alleged in the complaint as true, the non-moving party has failed to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The facts alleged must be sufficient to "raise a right to relief above the speculative level." *Id.* at 555. This requirement "calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of" necessary elements of the non-moving party's cause of action. *Id.* Furthermore, to satisfy federal pleading requirements, the non-moving party must "provide the grounds of his entitlement to relief," which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (cleaned up) (quoting *Twombly*, 550 U.S. 544 at 555).

Lastly, the court should generally grant leave to amend a pleading before dismissing it as merely deficient. *See, e.g.*, *Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 482 F.3d 247, 252 (3d Cir. 2007). "Dismissal without leave to amend is justified only on the grounds of bad faith, undue delay, prejudice, or futility." *Alston v. Parker*, 363 F.3d 229, 236 (3d Cir. 2004).

## III.   DISCUSSION

Defendants seek dismissal of counts two through five of Bentler's Complaint. The court will address each count in turn.

### A. Count Two: Malicious Prosecution

To prove a malicious prosecution claim, a plaintiff must establish that:

> (1) the defendants initiated a criminal proceeding; (2) the criminal proceeding ended in plaintiff's favor; (3) the proceeding was initiated without probable cause; (4) the defendants acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding.

*Est. of Smith v. Marasco*, 318 F.3d 497, 521 (3d Cir. 2003). Bentler claims Defendants Corporal Nilon and Trooper Yanochko maliciously prosecuted him for the three counts of attempted murder of a law enforcement official, 18 Pa.C.S.A. §2507(a), for which the state court granted judgment of acquittal. Corporal Nilon and Trooper Yanochko attack Bentler's pleading with respect to the first four elements; but it is the second element, favorable termination, that warrants careful examination at this stage.

To plead favorable termination, the plaintiff must allege the criminal prosecution ended without a conviction. *Thompson v. Clark*, 142 S. Ct. 1332, 1341 (2022). Application of the straightforward holding in *Thompson* is not as straightforward in a case like the one at bar where the plaintiff was

prosecuted for multiple crimes, convicted of some, and acquitted of others. In this situation, the Third Circuit, pre-*Thompson*, counseled:

> The favorable termination element is not categorically satisfied whenever the plaintiff is acquitted of just one of several charges in the same proceeding. When the circumstances—*both the offenses as stated in the statute and the underlying facts of the case*—indicate that the judgment as a whole does not reflect the plaintiff's innocence, then the plaintiff fails to establish the favorable termination element.

*Kossler v. Crisanti*, 564 F.3d 181, 188 (3d Cir. 2009) (emphasis added), *abrogated in part by Thompson*, 142 S. Ct. at 1341.

A review of *Thompson* reveals the Court abrogated *Kossler* only to the extent *Kossler* required plaintiffs to proffer affirmative evidence of innocence in addition to a lack of conviction, *e.g.*, with an acquittal by a trier of fact or a dismissal accompanied by some affirmative indication of innocence from the court or government. *See Thompson*, 142 S. Ct. at 1339. A Third Circuit panel in a recent unpublished opinion helpfully explained the state of the law post-*Thompson*:

> *Thompson* abrogated *Kossler's* holding that a favorable termination requires an affirmative indication of innocence and held that a plaintiff only needs to show that the prosecution ended without a conviction to establish a favorable termination. *Thompson*, 142 S. Ct. at 1335–36. *Thompson* did not address whether a proceeding can ever terminate in a plaintiff's favor when the prosecution did not end without a conviction on every charge. *Kossler* left open the possibility that even when a plaintiff is convicted on one charge but not the other, a court may still hold that the criminal proceeding favorably terminated if the

> charged offenses "*contained distinct statutory requirements*" and
> "*aimed to punish two different sets of conduct*." *Kossler*, 564 F.3d
> at 191.

*Alburg v. Jones*, No. 21-2580, 2023 WL 2823895, at *3 n.13 (3d Cir. Apr. 7, 2023) (emphasis added). The court agrees with the Third Circuit panel in *Alburg* that *Kossler's* favorable termination analysis as applied to cases where the plaintiff's underlying prosecution did not end without a conviction on every charge remains intact post-*Thompson*.

As indicated above, *Kossler's* favorable termination analysis prescribes a two-part inquiry to determine whether the plaintiff's criminal prosecution terminated in his favor when he was convicted of some but not all charges. First, we examine the relevant criminal statutes on their face to discern their legal relationship—*i.e.*, we ask whether the offenses of conviction and acquittal involved lesser-included offenses or shared common elements. *Kossler*, 564 F.3d at 188–89. Second, we review the underlying facts of the case—which, for purposes of a motion to dismiss, we draw from the complaint—to determine whether the charges Bentler was convicted of were predicated on the same factual basis as the charges of which he was acquitted. *Id.* If the charges Bentler was convicted of sought to punish the same underlying conduct as the charges of which he was acquitted, then the underlying criminal proceeding cannot be said to have

terminated in his favor. But if the charged offenses "contained distinct statutory requirements" and "aimed to punish two different sets of conduct," then acquittal on some of the charges may constitute favorable termination. *Id.* at 191.

Here, a review of the offenses charged in Bentler's prosecution reveals that under Pennsylvania law, a person is guilty of the first-degree felony of attempted murder of a law enforcement officer if he takes a substantial step towards an intentional killing of a law enforcement officer while in the performance of duty knowing the victim is a law enforcement officer. *See* 18 Pa.C.S.A. §2507(a) (murder of a law enforcement officer); *Commonwealth v. Johnson*, 874 A.2d 66, 71 (Pa. Super. 2005) (elements of attempted murder). A person is guilty of the second-degree felony of aggravated assault if he "attempts by physical menace to put any [police officer], while in the performance of duty, in fear of imminent serious bodily injury." 18 Pa.C.S.A. §2702(a)(6). The court focuses only on the charges of attempted murder of a police officer and aggravated assault, disregarding the various other charges brought against Bentler for now, because those offenses are the most similar and thus implicate "favorable termination" concerns. Bentler implicitly acknowledges this in his brief by restricting argument to only these offenses. (*See* Doc. 23 at 25–26). The court agrees with Bentler that

"attempted first degree murder of a law enforcement officer and aggravated assault are separate offenses, *i.e.*, aggravated assault is not a lesser included offense, and the two do not merge for sentencing purposes." (Doc. 23 at 32) (citing *Com. v. Johnson*, 874 A.2d 66, 71 (Pa. Super. 2005)). However, "the analysis does not end by merely examining the relevant criminal statutes on their face, but rather requires an inquiry into the underlying conduct that the charges sought to punish." *Kossler*, 564 F.3d at 189.

Moving to the second stage of the inquiry, then, the court finds that Bentler's charges of attempted murder of a police officer were predicated on the same factual basis as the charges of aggravated assault. A review of the facts alleged in Bentler's complaint reveals the attempted murder of police officer and aggravated assault charges all stemmed from the short, tense interaction between Bentler and law enforcement at the boat launch. As Bentler describes it, from the time Trooper Smith arrived at the boat launch, to his verbal commands to Bentler to put his gun down, to Corporal Nederostek's arrival, similar verbal commands, and multiple shots fired at Bentler after he, "with his rifle pointed at the ground, took a step out from the side of the disabled pick-up truck," (Doc. 1 at 10), only a few minutes passed. And, as Bentler acknowledges, "Corporal Nilon filed a criminal complaint

against Mr. Bentler *related to the events at the boat launch* the same day, *i.e.*, July 20, 2020[.]" (Doc. 23 at 10) (emphasis added).

Since he was convicted of aggravated assault, the jury ultimately found beyond a reasonable doubt that Bentler "attempt[ed] by physical menace to put any [police officer], while in the performance of duty, in fear of imminent serious bodily injury." 18 Pa.C.S.A. §2702(a)(6). That the judge granted a judgment of acquittal for Bentler on the charges of attempted murder of a law enforcement officer—whether it was because there was not sufficient evidence to show Bentler intended to kill the officers, or whether there was not sufficient evidence to show Bentler's actions did not constitute a "substantial step" towards a killing, or for some other reason, the Complaint does not explain—does not take the criminal prosecution as a whole outside the ambit of *Kossler* and its progeny, which preclude a finding of favorable termination on this record. *See, e.g., Kiriakidis v. Borough of Vintondale*, 609 F. App'x 713, 717 n.2 (3d Cir. 2015) (*Kossler* precluded favorable termination finding when the plaintiff's criminal charges "implicate[d] sufficiently similar conduct, stemming entirely from a traffic stop and subsequent exchange between [the plaintiff] and [defendant-officer]").

Therefore, since the aggravated assault convictions preclude a finding of favorable termination of Bentler's criminal proceeding, the court will

dismiss Bentler's malicious prosecution claim. Dismissal will be without prejudice since Bentler's convictions remain on appeal, and thus it is still possible for Bentler's criminal proceeding to terminate favorably should his convictions be disrupted and the prosecution end.

## B. Count Three: State-Created Danger & *Monell*

Next, Susquehanna County and the two County Dispatchers move to dismiss Bentler's state-created danger and municipal liability claims against them for violation of his substantive due process rights.

### 1. State-created danger claim against County Dispatchers

"As currently formulated" by the Third Circuit, the state-created danger theory of liability "requires a plaintiff to plead four elements: first, foreseeable and fairly direct harm; second, action marked by 'a degree of culpability that shocks the conscience'; third, a relationship with the state making the plaintiff a foreseeable victim, rather than a member of the public in general; and fourth, an affirmative use of state authority in a way that created a danger, or made others more vulnerable than had the state not acted at all." *Johnson v. City of Phila.*, 975 F.3d 394, 400 (3d Cir. 2020) (citing *Sauers v. Borough of Nesquehoning*, 905 F.3d 711, 717 (3d Cir. 2018)).

First, here, Bentler pleads the harm he suffered was a foreseeable and fairly direct consequence of County Defendants ignoring and minimizing his

mental instability and his panicked cry for help on the 911 call. (Doc. 1 at 23). County Defendants simply argue, without citation to controlling authority, that Bentler's harm was not a foreseeable consequence of their incomplete communication with PSP. The court finds Bentler has plausibly alleged the first element.

Second, "[f]or behavior by a government officer to shock the conscience, it must be more egregious than 'negligently inflicted harm,' as mere negligence 'is categorically beneath the threshold of constitutional due process.'" *Haberle v. Troxell*, 885 F.3d 170, 177 (3d Cir. 2018) (citing *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998)). "Instead, 'only the most egregious official conduct can be said to' meet that standard." *Id.* (citing *Cty. of Sacramento*, 523 U.S. at 846).

> "[T]he exact level of culpability required to shock the conscience . . . depends on the circumstances of each case, and the threshold for liability varies with the state actor's opportunity to deliberate before taking action." *Kedra v. Schroeter*, 876 F.3d 424, 437 (3d Cir. 2017). In "'hyperpressurized environments requiring a snap judgment,' an official must actually intend to cause harm in order to be liable." *Id.* (alteration omitted) (quoting *Vargas v. City of Phila.*, 783 F.3d 962, 973 (3d Cir. 2015)). "In situations in which the state actor is required to act 'in a matter of hours or minutes,' . . . the state actor [must] 'disregard a great risk of serious harm.' " *Id.* (quoting *Sanford v. Stiles*, 456 F.3d 298, 310 (3d Cir. 2006) (per curiam)). "And where the actor has time to make an 'unhurried judgment[ ],' a plaintiff need only allege facts supporting an inference that the official acted with a mental state of 'deliberate indifference.'" *Id.* (alteration omitted) (quoting *Sanford*, 456 F.3d at 309).

*Johnson*, 975 F.3d at 401. The Third Circuit in *Johnson* found a 911 operator's conduct did not shock the conscience when the operator directed a family to remain inside a burning building and wait for the fire department to arrive, but the operator failed to relay the family's location to the firefighters, leading to the family's death inside the building. *Id.* at 401–02. The Court noted that the plaintiff failed to plead conscious-shocking behavior because she "d[id] not allege that the Operator *intentionally* declined to relay the decedents' location to the [f]irefighters[;] instead, she argue[d] the Operator 'fail[ed] *inexplicably* to inform the firefighters of the decedents' existence, location, or need of rescue.'" *Id.* at 402 (emphasis in original).

Here, a fair reading of the Complaint indicates the actions of the County Dispatchers fell into the second category of temporal urgency since the dispatchers were required to act in a matter of minutes when they received the 911 call from Bentler and relayed the information to PSP. Thus, Bentler is required to plead the County Dispatchers disregarded a great risk of serious harm. Unlike the plaintiff in *Johnson*, Bentler alleges the County Dispatchers "*intentionally* and/or with disregard to a great risk of harm, downplayed the gravity of [Bentler's] situation and likened it to a run-of-the-mill disabled vehicle incident." (Doc. 1 at 23) (emphasis added). Accordingly, Bentler has plead enough at this stage to survive a motion to dismiss.

County Defendants argue in response that Bentler failed to plead conscious-shocking behavior because the purpose of the dispatchers in relaying the information to PSP "was to . . . retrieve the necessary aid to assist the Plaintiff," not to injure him. (Doc. 24 at 5–6). But that is a factual dispute which is irrelevant at the motion to dismiss stage.

Third, Bentler pleads he was "a foreseeable victim of County Defendants' actions, as they were dispatching emergency officials to a 911 call placed by [Bentler] concerning a mental health episode[.]" (Doc 1 at 23). County Defendants, again, simply argue in response that "[i]t was not reasonably foreseeable to the Susquehanna County Dispatchers that the Plaintiff would be shot by [PSP]," and "[t]he foreseeability of Plaintiff being shot is entirely too distant and misplaced to satisfy this prong." (Doc. 15 at 12). But this element does not focus on the harm; it focuses on the relationship between the state actor(s) and the victim. "[T]he relationship requirement of the third element contemplates some contact such that the plaintiff was a foreseeable victim of the defendant's acts in a tort sense." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 242 (3d Cir. 2008) (internal citation and quotation marks omitted). County Dispatchers and Bentler had such a relationship in this case, based on Bentler's pleading, since Bentler contacted County Dispatchers for help, and the dispatchers handled the

dispatch. *See, e.g.*, *Rivas v. City of Passaic*, 365 F.3d 181, 197 (3d Cir. 2004) (decedent was foreseeable victim where EMTs were responding to a 911 call at the decedent's household).

Fourth, Bentler pleads "County Defendants affirmatively exercised their authority to create a danger and/or make Bentler more vulnerable to danger than had they not acted at all." (Doc. 1). However, the actual conduct of the County Dispatchers as pleaded in the Complaint belies Bentler's characterization of it as *affirmative* misconduct, and thus Bentler's claim fails on this final element.

"The state-created danger theory requires [Bentler] to allege that the Dispatcher[s] 'affirmatively used . . . [their] authority in a way that created a danger to the [Bentler] or that rendered [him] more vulnerable to a danger than had [the Dispatchers] not acted at all'—*i.e.*, to allege an affirmative act." *Johnson*, 975 F.3d at 400.

> True, we have noted the "inherent difficulty in drawing a line between an affirmative act and a failure to act," and sometimes frame the inquiry as asking whether a defendant's "exercise of authority resulted in a departure from th[e] status quo." *Id.* at 242–43. But we have repeatedly held that an alleged failure to do something, standing alone, cannot be the basis for a state-created danger claim. *See, e.g., Burella v. City of Phila.*, 501 F.3d 134, 146–47 (3d Cir. 2007) (police officers' failure to intervene in domestic-violence situation did not satisfy element four).

- 19 -

*Id.* at 400–01. The Third Circuit in *Johnson* held the plaintiff did not allege affirmative conduct by the Dispatcher that caused the family's harms; rather, the plaintiff "claim[ed] only that the Dispatcher failed to communicate the Johnson Family's location to the firefighters." *Id.* at 401. The Court explained that was "a classic allegation of omission, a failure to do something[,]" *id.*, and the Court thus held the allegations were insufficient to state a claim for state-created danger.

Here, Bentler's allegations against County Dispatchers are similarly based on an omission. There are no allegations of affirmative conduct by the dispatchers that caused Bentler's harm. Rather, Bentler claims that the dispatchers failed to emphasize his mental instability, the fact that he feared excessive force, and the fact that he had a gun when they dispatched PSP to the scene. Bentler attempts to distinguish this case from *Johnson*, arguing *Johnson* was about "non-communication about the presence of the family in the apartment," while this case is about "communication to responders of events that were different than was 911 was called for." (Doc. 20 at 14–15). However, the court is not convinced this is a meaningful distinction that would rid *Johnson* of controlling authority here. Indeed, *Johnson's* facts could be recharacterized in the same way Bentler recharacterizes the facts in this case—*e.g.*, we could say *Johnson* was about "communication to the

responders of events that were different than as 911 was called for," since the dispatcher in *Johnson* was called by a family inside a burning building but dispatched the fire department for the burning building without mentioning the family. Accordingly, the court must follow the binding precedent of *Johnson* and find Bentler's allegations of state-created danger against the County Dispatches fail because they do not involve affirmative acts, only omissions. And thus, the court will dismiss Bentler's state-created danger claim without prejudice because it has not been shown that amendment would be futile.[1]

---

[1] PSP Defendants also seek dismissal of Bentler's state-created danger claim against unknown PSP Dispatcher Jane Doe. PSP Defendants' counsel acknowledges she does not represent the unknown dispatcher but appeals to the court's authority to *sua sponte* dismiss a claim where it is clear the plaintiff failed to state a claim for relief. *See Coulter v. Unknown Prob. Officer*, 562 F. App'x 87, 89 n.2 (3d Cir. 2014) ("We have recognized that, after service of process, a district court noting the inadequacy of a complaint may, on its own, dismiss it for failure to state a claim provided it affords the litigant prior notice and an opportunity to respond.") (citing *Oatess v. Sobolevitch*, 914 F.2d 428, 430 n.5 (3d Cir. 1990)). Bentler had an opportunity to respond to PSP Defendant's arguments in their motion to dismiss. And the court will *sua sponte* dismiss without prejudice Bentler's state-created danger claim against PSP Dispatcher Jane Doe because, similar to the claims against the County Dispatcher, Bentler failed to plead affirmative conduct. Moreover, Bentler also failed to plead conscious-shocking behavior on the part of the PSP dispatcher, since his allegations of intentional conduct are only against the County Defendants. (*See* Doc. 1, ¶155). Thus, Bentler's claim against PSP Dispatcher Jane Doe will be dismissed without prejudice since it has not been demonstrated that amendment would be futile.

## 2. *Municipal liability claim against Susquehanna County*

"A plaintiff seeking to hold a municipality liable under section 1983 must demonstrate that the violation of rights was caused by the municipality's policy or custom." *Thomas v. Cumberland Cnty.*, 749 F.3d 217, 222 (3d Cir. 2014) (citation omitted). "The Supreme Court has [also] recognized that 'under certain circumstances' a municipality may be liable under §1983 for a failure to adequately train its [emergency personnel]." *Brown v. Commonwealth of Pennsylvania, Dep't of Health Emergency Med. Servs. Training Inst.*, 318 F.3d 473, 482 (3d Cir. 2003) (citing *City of Canton v. Harris*, 489 U.S. 378, 380 (1989)). To plead a failure to train claim "the plaintiff must show that this failure 'amounts to "deliberate indifference" to the rights of persons with whom [the municipality's] employees will come into contact.'" *Johnson*, 975 F.3d at 403 (citing *Thomas v. Cumberland Cty.*, 749 F.3d 217, 222 (3d Cir. 2014)).

> "Ordinarily," this requires a plaintiff to identify a "'pattern of similar constitutional violations by untrained employees'" that "puts municipal decisionmakers on notice that a new program is necessary . . . ." [*Thomas*, 749 F.3d] at 223 (quoting *Connick v. Thompson*, 563 U.S. 51, 62, 131 S.Ct. 1350, 179 L.Ed.2d 417 (2011)). Otherwise, the plaintiff needs to show that failure to provide the identified training would "likely . . . result in the violation of constitutional rights"—*i.e.*, to show that "the need for more or different training [was] so obvious." *City of Canton v. Harris*, 489 U.S. 378, 390, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).

While it is true, as Bentler points out, the Third Circuit has stated in several cases that "[i]t is possible for a municipality to be held independently liable for a substantive due process violation even in situations where none of its employees are liable," the Court in those cases "note[d] that, for *Monell* liability to attach, 'there must still be a violation of the plaintiff's constitutional rights.'" *Johnson*, 975 F.3d at 403 n.13 (citing *Sanford v. Stiles*, 456 F.3d 298, 314 (3d Cir. 2006); *Brown*, 318 F.3d at 482)).

Here, for the reasons articulated above, Bentler's substantive due process rights were not violated when the County Dispatchers left out important details when relaying the substance of his 911 call to emergency personnel. Accordingly, "there can be no derivative municipal claim." *Mulholland v. Gov't Cty. of Berks*, 706 F.3d 227, 238 n.15 (3d Cir. 2013); *see also Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (if a municipal employee "inflicted no constitutional injury . . . it is inconceivable that [the municipality] could be liable"). And thus, the court will dismiss Bentler's municipal liability claim against Susquehanna County. Dismissal will be without prejudice since it has not been shown that amendment would be futile.

## C. Counts Four and Five: ADA and RA

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such a disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subject to discrimination by any such entity." 42 U.S.C. §12132. "Because the same standards govern both . . . RA and ADA claims, [the court] may address both claims in the same breath." *Chambers ex rel. Chambers v. Sch. Dist. Of Phila. Bd Of Educ.*, 587 F.3d 176, 189 (3d Cir. 2009). In order to state a claim under the ADA and RA, the plaintiff "must demonstrate: (1) he is a qualified individual; (2) with a disability; (3) [who] was excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or was subjected to discrimination by any such entity; (4) by reason of his disability." *Bowers v. Nat'l Collegiate Athletic Ass'n*, 475 F.3d 524, 553 n.32 (3d Cir. 2007).

"The first question, then, is whether arrestees can be 'qualified individuals' under the ADA, and the best response is that they can, for there is nothing to categorically exclude them from the statute's broad coverage." *Haberle*, 885 F.3d at 179. The second question is whether Bentler adequately alleges a disability. *See* 42 U.S.C. §12102(1) (defining "disability" for purposes of the ADA). Under the ADA, an "individual with a disability" is

defined as someone who (1) has a physical or mental impairment that substantially limits one or more major life activities; (2) has a record of such an impairment; or (3) is regarded as having such an impairment. *Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375, 380 (3d Cir. 2002).

At this stage of the litigation, Bentler must simply allege facts that permit a plausible inference that he was a qualified person with a disability within the meaning of the ADA. *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 213 (3d Cir. 2009). The court finds Bentler has done so. He alleges, among other things, that he had previously been diagnosed with bi-polar disorder, depression, and post-traumatic stress disorder—all of which are mental impairments that courts have held could constitute a disability under the ADA. *See, e.g.*, *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 302 (3d Cir. 1999) (holding a reasonable jury could find plaintiff was disabled when she presented evidence that bipolar disorder substantially limited a major life activity). Moreover, Bentler's Complaint demonstrates the events leading up to and at the boat launch arose out of his apparent mental health breakdown for which he called 911 for help. The court agrees with Bentler that his "prior mental health diagnoses coupled with the complete mental health breakdown he as experiencing and as detailed throughout the Complaint

quite plainly plead a plausible disability as required by the Federal Rules of Civil Procedure." (Doc. 23 at 15).

Next, to plead a claim for monetary damages under the ADA, Bentler must plausibly allege the County and PSP acted with deliberate indifference to the risk of an ADA violation. *Haberle*, 885 F.3d at 181. "[T]o plead deliberate indifference, a claimant must allege (1) knowledge that a federally protected right is substantially likely to be violated[,] and (2) failure to act despite that knowledge." *Id.* (internal quotation marks and citation omitted). Bentler can allege such deliberate indifference in one of two ways: "first, by alleging facts suggesting that the existing policies caused a failure to 'adequately respond to a pattern of past occurrences of injuries like the plaintiffs,' or, second, by alleging facts indicating that []he could prove 'that the risk of . . . cognizable harm was so great and so obvious that the risk and the failure . . . to respond will alone support finding' deliberate indifference. *Id.* (quoting *Beers-Capitol v. Whetzel*, 256 F.3d 120, 136-37 (3d Cir. 2001)).

Here, Bentler attempts to allege deliberate indifference under the second condition, *i.e.*, by showing the risk of harm was "so great and so obvious." (Doc. 23 at 18–23). He alleges the PSP officials at the boat launch never received "specialized training for interacting with individuals with mental health conditions," nor did they receive "any specialized training with

- 26 -

respect to individuals with mental health conditions or deescalating situations involving mentally unstable individuals and/or suspects." (Doc. 1). The court finds these allegations sufficient at this stage to permit a plausible inference that "the risk of an ADA violation in such circumstances [was] patently obvious." *Young v. Scott Twp.*, No. 4:18-CV-00403, 2018 WL 4539007, at *4 (M.D. Pa. Sept. 21, 2018) (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 n.10 (1989) (explaining some risks of cognizable harm are so obvious to permit a finding of deliberate indifference, such as when, hypothetically, city policymakers fail to train their officers in the constitutional limitations on the use of deadly force)). Similar to the hypothetical in *Canton*, 480 U.S. at 390 n.10, the probability of the police encountering a mentally ill individual is so great that a reasonably jury could find that failure to train officers on the constitutional and statutory obligations of an officer in those situations constitutes deliberate indifference. Bentler's allegations against the County survive at this stage for similar reasons—he alleges the County failed to train dispatchers to identify and convey information regarding the caller's mental disturbance or instability. A reasonably jury could find the probability that 911 dispatchers receiving a call from someone who is mentally ill is so obvious that a failure to train dispatchers in this regard constitutes deliberate indifference to the likelihood of an ADA violation.

Finally, Bentler must allege discrimination on the basis of his alleged disability. *Rinehimer*, 292 F.3d at 380. "If the arrestee's disability played a role in the . . . decisionmaking process and . . . had a determinative effect on the outcome of that process[,] *i.e.*, if the arrestee's disability was a 'but for' cause of the deprivation or harm he suffered, then the fourth element of an ADA claim has been met." *Haberle*, 885 F.3d at 179 (citing *CG v. Pa. Dep't of Educ.*, 734 F.3d 229, 236 n.11 (3d Cir. 2013) (internal quotation marks omitted).

The court finds Bentler's allegations against PSP—namely, *inter alia*, that "[d]espite knowing of the obvious risk that its troopers may discriminate on the basis of disability and/or fail to make reasonable accommodations when easting individuals with mental health conditions, the [PSP] chose not to provide its troopers with specialized training for interacting with individuals with mental health conditions"—are sufficient to plausibly allege discrimination on the basis of Bentler's alleged disability. [2] Bentler also

---

[2] The court declines at this time to apply the Fifth Circuit's exigent circumstances exception to the reasonable accommodation requirement under the ADA. *See Hainze v. Richards*, 207 F.3d 795 (5th Cir. 2000). "Several district courts within the Third Circuit . . . have declined to follow *Hainze* unless clearly 'exigent circumstances' were present at the time of the arrest." *Young v. Sunbury Police Dep't*, 160 F.Supp.3d 802, 809 n.33 (M.D. Pa. 2016) (collecting cases). Defendants are free to raise this argument again in a future motion after further factual development is accomplished through discovery.

alleged that Corporal Nederostek and Trooper Smith knew Bentler suffered

from a mental disability but failed to provide reasonable accommodations for

him in the execution of the arrest at the boat launch, such as "employing the

passage of time to advantage, using non-threatening communication,

respecting the individuals comfort zone and not unreasonably agitating or

exciting the individual and instead calming the situation." (*See* Doc. 1 at 25–

26). Relevant ADA and RA case law indicates these allegations are sufficient

to plausibly state a claim under the ADA and RA.[3] Thus, the court will deny

PSP Defendants' motion to dismiss Bentler's ADA and RA claims.[4]

---

[3] *See, e.g., Haberle*, 885 F.3d at 180 ("[P]olice officers may violate the ADA when making an arrest by failing to provide reasonable accommodations for a qualified arrestee's disability, thus subjecting him to discrimination"); *Williams v. Papi*, No. 3:13-CV-01151, 2016 WL 7155988, at *15 (M.D. Pa. Dec. 7, 2016), *rev'd in part on other grounds*, 714 F. App'x 128 (3d Cir. 2017) (denying motion to dismiss ADA and RA claims where "[t]he crux of Plaintiff's claim appears to be that the Defendants failed to make reasonable accommodations to ensure the safe execution of the involuntary mental health commitment warrant"); *Wingard v. Pennsylvania State Police*, No. 12-1500, 2013 WL 3551109, at *6 (W.D. Pa. July 11, 2013) ("It is recognized that both the ADA and the RA apply to require reasonable accommodation of a disability where first responders are both aware of the disability and can safely modify police practices to accommodate the disability.")

[4] County Defendants advance one argument in support of their motion to dismiss the ADA and RA claims against the County: there are no well-pleaded facts to show the County Dispatchers knew of should have known that Bentler suffered from recognized disabilities. (Doc. 18). But Bentler pleads the dispatchers knew he suffered from a mental health condition by virtue of his panicked 911 call. These allegations are sufficient at this stage

*(footnote continued on next page)*

## IV.    CONCLUSION

In light of the foregoing, the County Defendants' and PSP Defendants' motions to dismiss, (Docs. 12 & 13, respectively), will be **GRANTED in part and DENIED in part**. An appropriate order follows.


<em>s/ Malachy E. Mannion</em>

**MALACHY E. MANNION**
**United States District Judge**

**DATE: May 17, 2023**
22-1107-01

---

to plausibly infer County Dispatchers knew Bentler suffered from a mental disability, and the court will deny the County's motion to dismiss the ADA and RA claims against it.