UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| EDWARD LEE BENTLER, | |
| Plaintiff, | CIVIL ACTION NO. 3:22-cv-01107 |
| v. | (SAPORITO, J.) |
| NICHOLAS NEDEROSTEK, et al., | |
| Defendants. | |

## MEMORANDUM

This is a federal civil rights case. The plaintiff, Edward Lee Bentler, brings claims arising out of an incident in which he was shot by a state trooper, Corporal Nicholas Nederostek. Some of the plaintiff's claims have been dismissed previously. Three counts remain. In Count I, Bentler asserts a Fourth Amendment excessive force claim against Nederostek under 42 U.S.C. § 1983. In Counts IV and V, Bentler asserts disability discrimination claims against the Pennsylvania State Police ("PSP") under Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et seq.*, and Section 504 of the Rehabilitation Act of 1973 ("Section 504" or "RA").

The defendants have moved for summary judgment. Doc. 57. The motion is fully briefed and ripe for decision. Doc. 64; Doc. 72; Doc. 80; *see*

*also* Doc. 58; Doc. 70.

## I.   LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" only if the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. In deciding a summary judgment motion, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir. 1994).

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," and demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant makes such a showing, the non-movant must set forth specific facts, supported

- 2 -

by the record, demonstrating that "the evidence presents a sufficient disagreement to require submission to the jury." *Anderson*, 477 U.S. at 251–52.

In evaluating a motion for summary judgment, the Court must first determine if the moving party has made a prima facie showing that it is entitled to summary judgment. *See* Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S. at 331. Only once that prima facie showing has been made does the burden shift to the non-moving party to demonstrate the existence of a genuine dispute of material fact. *See* Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S. at 331.

Both parties may cite to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers or other materials." Fed. R. Civ. P. 56(c)(1)(A). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). "Although evidence may be considered in a *form* which is

inadmissible at trial, the *content* of the evidence must be capable of admission at trial." *Bender v. Norfolk S. Corp.*, 994 F. Supp. 2d 593, 599 (M.D. Pa. 2014); *see also Pamintuan v. Nanticoke Mem'l Hosp.*, 192 F.3d 378, 387 n.13 (3d Cir. 1999) (noting that it is not proper, on summary judgment, to consider evidence that is not admissible at trial).

## II.   MATERIAL FACTS[1]

The plaintiff, Edward Lee Bentler, physically assaulted a non-party, Enos White, on July 19, 2020. He then took a .22 caliber long rifle from White's home and left in a green pickup truck. Based on this incident, a

---

[1] In compliance with Local Rule 56.1, the defendants' motion for partial summary judgment is "accompanied by a separate, short and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried," Doc. 58. M.D. Pa. L.R. 56.1. Moreover, each factual statement presented by the defendants in support of their respective motions for summary judgment "include[s] references to the parts of the record that support the statements." *Id.*; *see also* Fed. R. Civ. P. 56(c)(1).

A party opposing summary judgment is likewise required by the local rules to file "a separate, short and concise statement of the material facts, responding to the numbered paragraphs" in the movant's statement of material facts, which must similarly "include references to the parts of the record that support the statements." M.D. Pa. L.R. 56.1. Here, the non-moving plaintiff has filed the requisite responsive statement of material facts, responding to the numbered paragraphs of the moving defendant's statement of material facts. Doc. 70.

The court's statement of material facts is based on the parties' respective statements, and where they conflict, disputed facts are viewed in the light most favorable to the non-moving plaintiff.

warrant was issued for Bentler's arrest. Although the warrant was issued at the application of another, non-party state trooper, the individual defendant, PSP Corporal Nicholas Nederostek, assisted in the investigation of the July 19 incident. Bentler later pleaded guilty to a misdemeanor charge of simple assault arising out of the July 19 incident.

That night, Bentler pulled the truck over at a boat launch during a rainstorm. As he attempted to turn the truck around, he drove the truck into a ditch. At approximately 7:00 a.m. on July 20, 2020, Bentler called 911 for assistance.

In response to a 911 dispatch, nonparty fire chief Robert Thatcher was the first to arrive at the boat launch. Thatcher observed that Bentler had a rifle on his lap and distanced himself from the plaintiff.

Nonparty state trooper Taylor Smith was the first PSP employee to arrive at the boat launch. Immediately after he exited his vehicle, Trooper Smith yelled to Bentler: "Let me see your hands!" Bentler did not immediately respond. Smith yelled at Bentler to "put your hands up so I can see you." Bentler then responded, "No." Smith then ordered Bentler to "get over here . . . put your hands up now." Bentler again responded, "No." Smith yelled, "Yes." Bentler responded, "No." Smith yelled, "Let me

see your hands." Bentler responded, "My hands are right here." Smith asked, "Where is the other one?" Before Bentler could reply, Smith yelled, "Just put 'em up so I can see them." Bentler immediately responded, "No."

Bentler then said, "I called for help, not for you to harass me." Smith stated, "Alright, well, I hear you have a gun. Dude, you have a gun in the truck. Step away from the truck and I'll leave you alone." Bentler responded, "No, I won't." Smith yelled, "Step away from the truck!" Bentler responded, "No." Bentler then asked Trooper Smith, "Do you got a weapon?" Smith replied, "Yeah. Put it down." Bentler responded, "Nope." Smith yelled, "Put it down!" Bentler responded, "No."

Trooper Smith then radioed PSP dispatch, stating, "6 Gibson. Subject has a rifle in his possession." Bentler yelled for help and said he was scared. Smith responded, "I'll help you. Put the gun down." Bentler responded, "You got to go first." Smith replied, "I'll put mine away when you put yours away." Bentler's next response was inaudible on the video recording. Smith responded, "Put the gun down." After a six second pause, Smith yelled again, "Put the gun down." Bentler replied, "No." After a five second pause, Smith screamed, "Put it down!" Bentler responded, "No." Smith screamed, "Put the gun down now!" Bentler

responded, "No." He said something more, but the recorded audio is inaudible. Smith yelled, "Put the gun down."

Approximately one-and-a-half minutes after Trooper Smith had arrived on scene, Corporal Nederostek and Trooper Gregory Yanochko arrived in separate vehicles. Smith asked Nederostek, "You got your rifle?" Nederostek responded, "I got the rifle out." Shortly after that, Smith yelled his last command at Bentler, directing him again to put the firearm down, and Nederostek began to engage with Bentler.

When Corporal Nederostek arrived, Bentler was standing by the bed of the pickup truck, on the passenger side. He was holding the rifle across his torso and pointed down towards the ground. Nederostek ordered Bentler to "Put the rifle down." Bentler did not immediately respond. Nederostek repeated, "Put it down." Bentler replied, "I asked for help." Nederostek yelled, "Put the rifle down, Eddie." Bentler did not respond. A few seconds later, Nederostek said, "Eddie, put it down." Bentler responded, "I need help man." Nederostek replied, "Alright, well you need to put the rifle down." Bentler responded, "No I don't. You need to put yours down." Nederostek replied, "Doesn't work like that Eddie, come on."

Then, within 45 seconds of his arrival, and less than 30 seconds after he had verbally engaged with Bentler, Nederostek saw Bentler discard his cigarette and step out from behind the side of the pickup truck. Nederostek immediately fired three shots at Bentler, striking him twice and causing him to fall to the ground. At the time when he stepped out from behind the truck, Bentler was still holding his rifle, which was angled down at the ground. Although Nederostek later testified at deposition that he subjectively believed that Bentler was about to raise the rifle to aim it at him and begin shooting, Nederostek confirmed in his testimony in state court criminal proceedings that Bentler never shouldered the firearm, never raised it, and never pointed or aimed it at Nederostek. At his own deposition, Bentler later testified that he had stepped out from behind the truck with the intent to discard the firearm.

Later that same day, nonparty PSP Corporal Daniel Nilon prepared and filed a criminal complaint with affidavit of probable cause concerning the events at the boat launch, charging Bentler with various felony and misdemeanor offenses. Ultimately, following a jury trial, Bentler was convicted of aggravated assault by physical menace under 18 Pa. Cons. Stat. Ann. § 2702(a)(6), simple assault by physical menace under 18 Pa.

Cons. Stat. Ann. § 2701(a)(3),[2] terroristic threats under 18 Pa. Cons. Stat. Ann. 2706(a)(1), and unlawful possession of a firearm by a convicted felon under 18 Pa. Cons. Stat. Ann. § 6105(a)(1). Bentler's criminal conviction was later upheld by the Superior Court of Pennsylvania on appeal. *See Commonwealth v. Bentler*, 303 A.3d 781 (unpublished table decision), 2023 WL 4761797 (Pa. Super. Ct. July 26, 2023)

The PSP provides training to its members on areas including but not limited to uses of force and situations involving individuals with mental illness.[3] In addition to training at the PSP Academy, PSP also provides its members with annual Mandatory Inservice Training (MIST). MIST trainings have, at times, covered topics related to mental illness. PSP provides training that incorporate de-escalation practices with mentally unstable individuals.[4] PSP provides yearly disability related

---

[2] We note that the state court docket sheet references § 2701(a)(1), but the criminal information upon which Bentler was convicted references § 2701(a)(3), which comports with the nature of the charges as discussed elsewhere in the state court record and other evidence in the summary judgment record.

[3] The plaintiff disputes the relevance of this training with respect to his excessive force claim. We agree, and we consider this fact statement only with respect to the plaintiff's ADA/RA disability discrimination claims against the PSP.

[4] These include PSP's policy on Use of Force (FR-9-1), Defs.' Ex. 5,

*(continued on next page)*

training, both through MIST programs and through online platforms.[5]

Corporal Nederostek, in particular, had received MIST training on

mental health issues.

III.    DISCUSSION

A. Application of *Heck v. Humphrey*

The defendants' first argument focuses on a particular disputed fact

in this case: whether, at the time when Corporal Nederostek employed

deadly force against him, Bentler was merely holding a rifle, pointed at

the ground, or if he had raised and aimed the rifle at the state troopers.

Courts of this circuit have recognized that an officer's use of deadly force

may be reasonable as a matter of law—or at least not in violation of

clearly established law, thus entitling the officer to qualified immunity—

when the subject of the officer's use of deadly force had aimed or pointed

---

Doc. 58-5, and its policy on Incidents Involving Persons with Mental Illness / Mental Health Emergencies (AR 7-3), Defs.' Ex. 6, Doc. 58-6.

[5] In their statement of material facts, the moving defendants characterized these training programs as training on the Americans with Disabilities Act and the Rehabilitation Act. The plaintiff has disputed this characterization, noting that none of the training materials in the record are so titled. The supporting evidence cited by the moving defendants is deposition testimony in which the deponent was asked about "ADA training" and described the yearly "disability related training" available to PSP members.

a gun at the officer. *See, e.g.*, *Lamont v. New Jersey*, 637 F.3d 177, 183–84 (3d Cir. 2011) (affirming summary judgment on qualified immunity grounds with respect to initial use of deadly force where troopers encountered a fleeing car theft suspect who, when ordered to show his hands and freeze, abruptly pulled his hand out of his waistband as though to draw a pistol); *Goode v. City of Phila.*, No. 10-894, 2018 WL 827425, at *8 (E.D. Pa. Feb. 12, 2018) (granting summary judgment on the merits in favor of police officer who used deadly force against suspect pointing a handgun at him). *See generally Smith v. Grandsen*, No. 08-4517, 2011 WL 5080320, at *2 (D.N.J. Oct. 25, 2011) ("Generally, deadly force is warranted when there is an imminent threat of serious physical injury or death to officers, bystanders or the public.").

The plaintiff contends that, at the time when Nederostek shot him, Bentler was merely holding his rifle, which was pointed toward the ground.[6] The plaintiff has pointed to various items of evidence to support this position, including video recordings from the troopers' vehicles.

The defendants, on the other hand, contend that Corporal

---

[6] Bentler contends that he was about to throw the rifle down, in compliance with the troopers' orders to "put it down." It is his actions, however, not his subjective intent, that are at issue in this case.

Nederostek was prompted to use deadly force because Bentler had pointed or aimed the rifle at Nederostek, thus posing an imminent threat of serious bodily injury to the defendant state trooper. Ordinarily, this would constitute a genuine dispute of material fact, the resolution of which is reserved to a jury at trial.

But the defendants argue that Bentler's § 1983 excessive force claim against Nederostek is barred by the favorable termination rule articulated by the Supreme Court in *Heck v. Humphrey*, 512 U.S. 477 (1994). In *Heck*, the Supreme Court held that, where judgment in favor of a plaintiff in a § 1983 action for damages would necessarily imply the invalidity of the plaintiff's conviction or sentence, the plaintiff must first demonstrate "that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus [under] 28 U.S.C. § 2254." *Id.* at 486–87. In *Wilkinson v. Dotson*, 544 U.S. 74 (2005), the Supreme Court reaffirmed this rule and broadened it to encompass equitable remedies as well, holding that, under *Heck*, a "§ 1983 action is barred (absent prior invalidation)—no matter what the relief sought

(damages or equitable relief), no matter the target of the . . . suit (state conduct leading to conviction or internal prison proceedings)—*if* success in that action would necessarily demonstrate the invalidity of confinement or its duration." *Id.* at 81–82.

We note that "*Heck* typically does not bar actions for Fourth Amendment violations." *Sanders v. Downs*, 420 Fed. App'x 175, 179 (3d Cir. 2011) (per curiam); *see also Nelson v. Jashurek*, 109 F.3d 142, 145–46 (3d Cir. 1997) (holding that *Heck* did not foreclose excessive force claim); *Lora-Pena v. F.B.I.*, 529 F.3d 503, 506 (3d Cir. 2008) (per curiam) (declining to apply *Heck* to bar an excessive force claim). But "even where a particular type of conviction is not necessarily inconsistent with a § 1983 suit, courts look to the underlying facts . . . to assess whether a claim is barred by *Heck*." *Ramos-Ramirez v. Berwick Borough*, 819 Fed. App'x 103, 106 (3d Cir. 2020); *see also Gibson v. Superintendent of N.J. Dep't of Law & Pub. Safety*, 411 F.3d 427, 448 (3d Cir. 2005), *abrogated on other grounds*, *Dique v. N.J. State Police*, 603 F.3d 181, 188 (3d Cir. 2010). This "fact-based approach requires a district court to inquire into the nature of the criminal conviction and the antecedent proceedings." *Gibson*, 411 F.3d at 451. "[T]o determine *Heck*'s applicability, a court

must ask whether the plaintiff could prevail only by negating an element of the offense of which he was convicted." *Ramos-Ramirez*, 819 Fed. App'x at 106 (citation modified) (quoting another source).

Here, Bentler was convicted of aggravated assault by physical menace under 18 Pa. Cons. Stat. Ann. § 2702(a)(6). Under this statute, "[a] person is guilty of aggravated assault if he . . . attempts by physical menace to put [a state law enforcement officer],[7] while in the performance of duty, in fear of imminent serious bodily injury." 18 Pa. Cons. Stat. Ann. § 2702(a)(6). The defendants argue that a judgment in favor of Bentler on his § 1983 excessive force claim would necessarily imply the invalidity of his aggravated assault conviction because the state court jury verdict was premised on a factual finding that Bentler attempted to put state troopers and fire personnel in fear of imminent serious bodily injury by pointing a rifle at them.

But, under this statute, "[o]ne is not required to 'point or shoot a

---

[7] The statute includes a list of 39 enumerated categories of "officers, agents, employees or other persons" covered by its provisions. These include various types of federal, state, and local law enforcement officers, as well as state court judges, district attorneys, public defenders, firefighters, emergency medical service providers, psychiatric and health care providers, teachers and other school officials, various state elected officials, and public utility workers. *See* 18 Pa. Cons. Stat. Ann. § 2702(c).

firearm in order to be found guilty of [aggravated] assault by physical menace.'" *Fitzgerald v. Cnty. of Lehigh*, 381 F. Supp. 3d 443, 457 (E.D. Pa. 2019) (quoting *Commonwealth v. Olsen*, No. 1861 WDA 2016, 2017 WL 6523267, at *4 (Pa. Super. Ct. Dec. 21, 2017)); *see also Commonwealth v. Jumaili*, No. 43 EDA 2025, 2026 WL 575199, at *5 (Pa. Super. Ct. Mar. 2, 2026) ("A defendant in possession of a gun need not point it at the victim to be found guilty of simple assault by physical menace."); *Commonwealth v. Plank*, No. 3198 EDA 2013, 2014 WL 10803143, at *4 (Pa. Super. Ct. Aug. 25, 2014) ("[T]here is no case law in this Commonwealth that mandates that an individual cannot be found guilty of the crime of simple assault by physical menace, absent having pointed a firearm directly at the victim.").[8]

---

[8] We note that court decisions interpreting the statutory language of the physical menace subsection of the aggravated assault statute, § 2702(a)(6), have relied on decisions interpreting the statutory language of the corresponding provision of the simple assault statute, § 2701(a)(3), as well. "The language of § 2702(a)(6) is nearly identical to the language used to define simple assault in § 2701(a)(3). The only difference between the two sections is whether the victim of the assault is a law enforcement agent." *Cairns v. McGinley*, No. 19-5351, 2023 WL 5432498, at *14 n.7 (E.D. Pa. Aug. 23, 2023) (citation omitted); *Commonwealth v. Repko*, 817 A.2d 549, 554 (Pa. Super. Ct. 2003) ("The salient difference between the simple assault by physical menace subsection and the aggravated assault by physical menace subsection is the occupation of the victim; the
*(continued on next page)*

- 15 -

For example, in *Commonwealth v. Little*, 614 A.2d 1146 (Pa. Super. Ct. 1992), the Superior Court of Pennsylvania affirmed a conviction for simple assault by physical menace where the defendant "erratically emerged from her home carrying a shotgun, shouting and advancing from her porch" at sheriff's deputies while they were attempting to serve her with mortgage foreclosure papers. *Id.* at 1148. The parties stipulated in *Little* that the criminal defendant held the shotgun "'in the cradle,' or in one arm, visible to onlookers," but "never pointed the gun at the deputies." *Id.* at 1148 n.2. The court concluded that, although the criminal defendant "never pointed the gun at the deputies, . . . her overall demeanor and actions were designed to, and did in fact, put the deputies in fear of imminent serious bodily injury." *Id.*

Similarly, the Superior Court has upheld convictions for simple assault by physical menace in other cases where a criminal defendant merely brandished a firearm, without pointing it at his victims, and

---

aggravated assault subsection requires that the victim be one of [39] enumerated 'officers, agents, or employees,' while the simple assault subsection requires that the victim merely be another person."), *overruled en banc on other grounds by Commonwealth v. Matthews*, 870 A.2d 924 (Pa. Super. Ct. 2005), *aff'd*, 909 A.2d 1254 (Pa. 2006). We have done the same here.

exhibited other hostile behavior. *See Jumaili*, 2026 WL 575199, at \*5; *Plank*, 2014 WL 100803143, at \*4; *see also Commonwealth v. Mead*, 326 A.3d 1006, 1011 n.2 (Pa. Super. Ct. 2024) (noting, in the context of a weight of the evidence claim, that even without the victim's testimony that the criminal defendant *pointed* an AR-style rifle at her, other evidence that the defendant brandished an AR-style rifle was sufficient to prove simple assault by physical menace).

Based on the foregoing, we are unable to conclude that the plaintiff can only prevail in this case by negating a necessary element of his offense of conviction. On the record before us, viewed in the light most favorable to the non-moving plaintiff, a reasonable jury could find that Bentler did not raise or aim his rifle at Corporal Nederostek, and that finding would not necessarily imply the invalidity of his criminal conviction for aggravated assault by physical menace.[9]

---

[9] In their reply brief, the defendants pivot to a new, albeit parallel, argument in support of this same theory, shifting from whether Bentler pointed or aimed a firearm at state troopers to a perfunctory argument about whether Bentler more generally posed a serious risk of imminent serious bodily injury. But arguments raised for the first time in a reply brief are waived. *See Brand Design Co. v. Rite Aid Corp.*, 623 F. Supp. 3d 526, 537 n.3 (E.D. Pa. 2022); *Yurth v. Experian Info. Sols.*, 622 F. Supp. 3d 89, 98 (E.D. Pa. 2022); *Javitz v. Luzerne Cnty.*, 616 F. Supp. 3d 394,

*(continued on next page)*

407 (M.D. Pa. 2022). Moreover, even without the benefit of any response to this new argument from the non-moving plaintiff, we find it unpersuasive. While both the criminal prosecution and this civil case involve determinations touching on the prospect of serious bodily injury at the time of the incident at the boat launch, the focus of that inquiry in the criminal prosecution of Bentler for aggravated assault by physical menace and the focus of that inquiry in connection with Bentler's excessive force claim are distinctly different. In this case, the court and a jury must consider whether, under the circumstances presented, a reasonable police officer in Corporal Nederostek's shoes would have perceived that Bentler posed an imminent threat of serious bodily injury to that officer or to others present at the scene. In the state criminal proceedings, the jury considered whether *Bentler* had the specific, subjective intent to put Nederostek or the other troopers in fear of imminent serious bodily injury, and whether Nederostek or the other troopers were actually placed in such fear is relevant but not dispositive of the charged offense. *See Commonwealth v. Stumpo*, 452 A.2d 809, 815 (Pa. Super. Ct. 1982); *see also Commonwealth v. Bentler*, 303 A.2d 781 (unpublished table decision), 2023 WL 4761797, at *8 (Pa. Super. Ct. 2023) (focusing on our plaintiff's "specific intent" and whether "Bentler intended to place the three state troopers in fear of imminent serious bodily injury"); *Plank*, 2014 WL 10803143, at *4 (focusing on whether "it was [the criminal defendant's] conscious object or purpose to cause fear of serious bodily injury") (quoting *Little*, 614 A.2d at 1151); *Commonwealth v. Leatherbury*, 473 A.2d 1040, 1042–43 (Pa. Super. Ct. 1984) (focusing on whether the defendant "intended by his conduct to put [the victim] in fear of imminent serious bodily injury"). *See generally United States v. Hurtt*, 105 F.4th 520, 524 (M.D. Pa. 2024) ("[W]e understand § 2702(a)(6) to require, at a minimum, some physical act with the mental state of specific intent to threaten an officer or other statutorily listed individual with corporeal harm.") (internal quotation marks and brackets omitted). A jury's determination in this case that, under the circumstances presented, a reasonable police officer would not have perceived a threat of imminent serious bodily injury would not necessarily imply the invalidity of the state court jury's determination that, under the very same circumstances, Bentler intended to put the state troopers in fear of such an imminent serious bodily injury.

### B. Corporal Nederostek and Qualified Immunity

The defendants have interposed an affirmative defense of qualified immunity with respect to the plaintiff's excessive force claim against Corporal Nederostek.

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* Qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). "Thus, so long as an official reasonably believes that his conduct complies with the law, qualified immunity will shield that official from liability." *Sharp v. Johnson*, 669 F.3d 144, 159 (3d Cir. 2012) (citing *Pearson*, 555 U.S. at 244). Although qualified immunity is generally a question of law that

should be considered at the earliest possible stage of proceedings, a genuine dispute of material fact may preclude summary judgment on qualified immunity. *Giles v. Kearney*, 571 F.3d 318, 325–26 (3d Cir. 2009).

A qualified immunity determination involves a two-pronged inquiry: (1) whether a constitutional or federal right has been violated; and (2) whether that right was "clearly established." *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled in part by Pearson*, 555 U.S. at 236 (permitting federal courts to exercise discretion in deciding which of the two *Saucier* prongs should be addressed first). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202.

In the Third Circuit, it is the party asserting the affirmative defense of qualified immunity who bears the burden of persuasion. *Halsey v. Pfeiffer*, 750 F.3d 273, 288 (3d Cir. 2014). Thus, the moving defendants must

> show that there was no genuine dispute of material fact to refute their contention that they did not violate [the plaintiff's] constitutional rights as he asserted them, or show that reasonable officers could not have known that their conduct constituted such a violation when they engaged in it.

*Id.*

We start here with the first prong of the *Saucier* analysis. "The use of excessive force during an arrest is a cognizable violation under the Fourth Amendment." *Geist v. Ammary*, 40 F. Supp. 3d 467, 475 (E.D. Pa. 2014) (citing *Bell v. Wolfish*, 441 U.S. 520, 534 n.16 (1979)). "[A] plaintiff may prevail on an excessive force claim if he can show that a seizure occurred and that the seizure 'was unreasonable under the circumstances.'" *Brown v. Cwynar*, 484 Fed. App'x 676, 679 (3d Cir. 2012) (quoting *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011)).

"A seizure occurs when a suspect 'submits to the police's show of authority or the police subject him to some degree of physical force.'" *Id.* at 680 (quoting *Abraham v. Raso*, 183 F.3d 279, 291 (3d Cir. 1999)). Thus, it is undisputed that Bentler was "seized" by Corporal Nederostek.

As for whether that seizure was reasonable, "we examine the objective reasonableness of the officer['s] conduct." *Santil v. Borough of Carteret*, No. 22-2898, 2024 WL 3565308, at *8 (3d Cir. July 29, 2024) (citing *Santini v. Fuentes*, 795 F.3d 410, 417 (3d Cir. 2015)). "This requires that we consider whether under the totality of the circumstances, the officer['s] actions are objectively reasonable in light of

the facts and circumstances confronting them, without regard to their underlying intent or motivations." *Id.* (internal quotation marks omitted) (quoting *Kopec v. Tate*, 361 F.3d 772, 776 (3d Cir. 2004)).

> The following factors guide our analysis: (1) the severity of the crime at issue, (2) whether the suspect poses an imminent threat to the safety of the police or others in the vicinity, (3) whether the suspect attempts to resist arrest or flee the scene, (4) the possibility that the persons subject to the police action are themselves violent or dangerous, (5) the duration of the action, (6) whether the action takes place in the context of effecting an arrest, (7) the possibility that the suspect may be armed, and (8) the number of persons with whom the police officers must contend at one time.

*Id.* at *8 n.16 (citation modified) (first quoting *Santini*, 795 F.3d at 417 (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989) (identifying the first three factors)); and then quoting *Sharrar v. Felsing*, 128 F.3d 810, 822 (3d Cir. 1997) (identifying the last five factors), *abrogated on other grounds by Curley v. Klem*, 499 F.3d 199, 209–11 (3d Cir. 2007)); *see also Arditi v. Subers*, 216 F. Supp. 3d 544, 558 (E.D. Pa. 2016) (citing *Kopec*, 361 F.3d at 776–77); *Geist*, 40 F. Supp. 3d at 476. Courts of the Third Circuit have also considered a ninth factor—whether the force led to physical injury to the plaintiff. *See Sharrar*, 128 F.3d at 822; *El v. City of Pittsburgh*, 975 F.3d 327, 338 (3d Cir. 2020); *Arditi*, 216 F. Supp. 3d at 558.

Moreover,

> [t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . . The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

*Graham*, 490 U.S. at 396–97. "Because the inquiry is so fact-dependent, . . . the reasonableness of the use of force is normally an issue for the jury." *Jefferson v. Lias*, 21 F.4th 74, 79 (3d Cir. 2021) (internal quotation marks omitted).

With respect to the first factor—the severity of the crime at issue—the moving defendants point to Nederostek's awareness that Bentler had assaulted someone and stole a firearm the previous day.[10] In response,

---

[10] In their briefs, the defendants have included flourishes that rely on disputed facts or on facts not included in their own statement of material facts. The defendants' briefs state that Bentler "brutally assaulted an elderly citizen and stole a firearm and a truck." Defs.' Br. Supp. 15, Doc. 64; Defs.' Reply Br. 5, Doc. 80. Their statement of material facts does not characterize the assault at all, stating only that Bentler "physically assaulted" Enos White on July 19 , 2020. Defs.' Statement of Material Facts ¶ 1, Doc. 58. It also does not provide any characterization of White as "elderly." *Id.* It is undisputed that Bentler assaulted White and took the rifle from him, and Bentler pleaded guilty and was convicted

*(continued on next page)*

the plaintiff points to case law holding that the "severity of the crime" under this factor decreases when the crime is completed and no longer in progress at the time of the use-of-force incident, and thus constitutes a factual dispute for a jury to determine. *See Bermudez v. Cnty. of San Bernadino*, No. EDCV 20-438, 2021 WL 6618857, at \*9 (C.D. Cal. Dec. 6, 2021) (citing *S.R. Nehad v. Browder*, 929 F.3d 1125, 1136 (9th Cir. 2019)). We agree that the facts regarding this factor are in genuine dispute.

With respect to the second factor—whether the suspect poses an imminent threat to the safety of the police or others in the vicinity—the moving defendants point to several facts that militate in favor of a finding that Bentler posed such an imminent threat to safety, including Nederostek's awareness of the prior day's assault and theft of a firearm by Bentler,[11] Bentler's current possession of that firearm, and Bentler's refusal to comply with orders to drop the rifle.[12] The plaintiff argues that

---

of simple assault and theft of movable property as a result. The plaintiff has effectively demonstrated a genuine dispute of fact with respect to whether Bentler was authorized to use the truck at issue.

[11] The defendants also refer to a stolen truck, but whether Bentler was authorized to use the truck is disputed. *See supra* note 10.

[12] The defendants also rely on a disputed fact—whether Bentler raised the rifle to point it at the state troopers—and on Bentler's "history of drug use," but the parties' statements of material facts do not point to

*(continued on next page)*

he never posed an imminent threat to safety because he never raised the rifle, and he was preparing to throw it down when shot. The facts regarding this factor are in genuine dispute.

With respect to the third factor—whether the suspect attempts to resist arrest or flee the scene—the moving defendants suggest that Bentler evaded arrest after assaulting Enos White the day prior, and that he resisted arrest by refusing to comply with the state troopers' orders to show his hands and drop his weapon. In response, the plaintiff points to the fact that it was Bentler himself who called 911 to report his location on July 20, to the fact that the truck was disabled at the time of the use-of-force incident, and to the fact Bentler had made no effort to flee the scene at that time.[13] The plaintiff further points to case law holding that

---

any competent evidence of such a history. At most, the plaintiff's history as a drug user is a disputed fact.

[13] The plaintiff also points to the absence of any evidence in the record to suggest that Bentler was aware that a warrant had been issued for his arrest as a result of the July 19 incident. The moving defendants make a good point in reply to this fact: Our analysis of the reasonableness of the seizure at issue is focused on the perspective of a reasonable police officer at the scene, not the plaintiff's subjective awareness. But while Corporal Nederostek was clearly aware of the arrest warrant, there is no evidence in the record to suggest that Bentler had "evaded" arrest in connection with that incident. Regardless, this factor is sufficiently disputed to make it a jury issue.

"noncompliance with commands does not, without more, rise to active resistance." *King v. City of Rockford*, 97 F.4th 379, 396 (6th Cir. 2024). The facts regarding this factor also remain in genuine dispute.

With respect to the fourth factor—the possibility that the persons subject to the police action are themselves violent or dangerous—the plaintiff has conceded that he had assaulted nonparty Enos White the day before, and that he was in possession of a rifle. Nevertheless, the plaintiff argues that this factor alone is not sufficient to justify the use of deadly force. We agree that, standing alone, this factor is not dispositive of the reasonableness analysis overall, but this factor clearly weighs in favor of reasonableness.

With respect to the fifth factor—the duration of the action—the parties spar over whether the relevant time period in this action is "a few minutes" or "mere seconds," with both parties relying on the Third Circuit's opinion in *El v. City of Pittsburgh*, 975 F.3d 327 (3d Cir. 2020). In *El*, the Third Circuit found this factor to weigh in favor of the plaintiff with respect to an excessive force claim against a police officer where "the situation unfolded over the course of a few minutes, not a few tense and dangerous seconds." *Id.* at 337. The parties dispute whether the relevant

time frame for this factor is the period of a few minutes over which this entire incident unspooled, or the period of approximately 45 seconds that Corporal Nederostek was present on the scene before shooting Bentler. Under these circumstances, we find the facts regarding this factor, including the duration of the relevant time period to be considered, remain in genuine dispute.

With respect to the sixth factor—whether the action takes place in the context of effecting an arrest—it appears to be undisputed that the action here took place in that context. While Bentler may have called 911 for help, there is no dispute that the responding state troopers were advised by dispatchers that they were responding to a call involving a person with a firearm, and they were aware that Bentler was subject to an outstanding arrest warrant. The facts regarding this factor clearly weigh in favor of reasonableness.

With respect to the seventh factor—the possibility that the suspect may be armed—it is undisputed that Bentler was armed with a rifle. The facts regarding this factor clearly weigh in favor of reasonableness.

With respect to the eighth factor—the number of persons with whom the police officers must contend at one time—it is undisputed that

the state troopers outnumbered Bentler three to one.[14] The facts regarding this factor clearly weigh against reasonableness.

With respect to the ninth factor—whether the force led to physical injury to the plaintiff—it is undisputed that Bentler sustained two gunshot wounds as a result of this use-of-force incident. The facts regarding this factor clearly weigh against reasonableness.

Based on the evidence of record, viewed in the light most favorable to the non-moving plaintiff, a reasonable jury could conclude that Corporal Nederostek's use of deadly force against Bentler under the circumstances set forth above constitutes an unreasonable seizure, in violation of Bentler's Fourth Amendment rights.

Despite the existence of a genuine dispute of material fact on the merits of the plaintiff's § 1983 excessive force claim, the defendants may nevertheless prevail on summary judgment with respect to this claim

---

[14] In their brief in support, the moving defendants suggest that this factor is neutral because there was only one officer on the scene. *See* Defs.' Br. Supp. 14 n.5. This appears to be a drafting error by counsel, as it is clearly undisputed that Corporal Nederostek was one of *three* state troopers on the scene at the time of the shooting. Trooper Smith arrived on scene before Nederostek and had been verbally engaged with Bentler before Nederostek's arrival. Trooper Yanochko arrived at the same time as Nederostek, in a separate vehicle.

under the second prong of the *Saucier* analysis.

"In determining whether a right has been clearly established, the court must define the right allegedly violated at the appropriate level of specificity." *Sharp*, 669 F.3d at 159. If the right is defined too broadly, at a high level of generality, it risks "convert[ing] the rule of qualified immunity that our cases plainly establish into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987). "We are thus required to frame the right at issue in a more particularized, and hence more relevant, sense, in light of the case's specific context, not as a broad general proposition." *Spady v. Bethlehem Area Sch. Dist.*, 800 F.3d 633, 638 (3d Cir. 2015) (citations and internal quotation marks omitted).

> The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Anderson*, 483 U.S. at 640 (citation omitted).

Here, the moving defendants suggest that the specific context is whether a police officer may constitutionally use lethal force against an

individual who had brutally assaulted an elderly person,[15] was suspected of being high on illegal substances,[16] stole a firearm and a vehicle,[17] was the subject of an arrest warrant, possessed a deadly weapon (a rifle), violated and disregarded multiple officers' orders to drop the rifle, and then pointed his rifle toward the officer[18] and the officer believed his own life and others' lives were in danger. Defs.' Br. Supp. 9. They argue that the plaintiff is unable to point to a prior decision addressing identical facts.

At that level of specificity, there indeed appears to be no prior case law finding an officer's conduct unconstitutional.[19] But this articulation of this case's specific context would effectively require us to find the defendant "protected by qualified immunity unless the very action in question has previously been held unlawful." *See Anderson*, 483 U.S. at 640. The plaintiff's articulation of the specific context is closer to the mark: Whether an individual holding a rifle and initially refusing

---

[15] *But see supra* note 10.

[16] *But see supra* note 12.

[17] *But see supra* note 10.

[18] *But see supra* note 12.

[19] What case law exists cuts the other way, particularly based on a firearm being pointed at a police officer or others.

commands to drop the weapon, but who is holding the rifle pointed down, telling officers he needs help, and not pointing, leveling, or aiming the rifle at himself or others, is constitutionally protected from the use of lethal force. Pl.'s Br. Opp'n 19, Doc. 72. Ultimately, in the context of summary judgment, where we are required to view the facts in the light most favorable to the non-moving plaintiff, we find the specific context presented to be: Whether a police officer may constitutionally use lethal force against an individual who is holding a rifle, pointed down, who has not pointed or aimed the rifle at officers or others, but who has refused multiple commands to drop the rifle.

In evaluating whether a constitutional right is clearly established, we must first look to factually analogous Supreme Court precedent, as well as binding Third Circuit opinions. *Peroza-Benitez v. Smith*, 994 F.3d 157, 165 (3d Cir. 2021). Next, we must consider whether there is a "a robust consensus of cases of persuasive authority." *Id.*; *see also Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). This persuasive authority may include appellate decisions from other circuits, or district court decisions, from within the Third Circuit or elsewhere. *Id.*; *see also Doe v. Delie*, 257 F.3d 309, 321 & n.10 (3d Cir. 2001).

Viewed in this context, it is apparent to us that any reasonable officer would have known in July 2020 that the use of deadly force against an individual holding a firearm, pointed down at the ground and not pointed or aimed at officers or others, was unreasonable, despite the individual's prior refusal to comply with multiple commands to drop the weapon. *See Bennett ex rel. Estate of Bennett v. Murphy*, 120 Fed. App'x 914, 918 (3d Cir. 2005) (holding that it had been "clearly established prior to this [January 1994] incident . . . that under *Graham* and *Garner*[20] law enforcement officers may not kill suspects who do not pose an immediate threat to their safety or to the safety of others simply because they are armed") (internal quotation marks and brackets omitted); *see also Hyer v. City of Honolulu*, 118 F.4th 1044, 1067 (9th Cir. 2024) (holding that "it was clearly established by June 22, 2018, that the use of deadly force is unreasonable where the victim does not directly threaten the officer with a weapon, even if the officers know the victim is armed") (internal quotation marks omitted); *Aleman v. City of Charlotte*, 80 F.4th 264, 295 (4th Cir. 2023) (holding that "it was clearly established in September 2017 that an officer would contravene the Fourth Amendment by using

---

[20] *Tennessee v. Garner*, 471 U.S. 1 (1985).

deadly force against a suspect who is holding a firearm in his hand and ignoring commands to drop the weapon, but who is standing still in a position of surrender, is not firing the weapon or aiming it any person, and is not otherwise making a furtive or threatening movement that would suggest he had an intent to use the weapon to harm the officer or anyone else").

In their supporting brief, the moving defendants cite several cases from courts in this circuit in support of their argument on this point, but the cited cases are inapposite. In *Daniels v. City of Pittsburgh*, No. 18-1019, 2022 WL 952855 (W.D. Pa. Mar. 30, 2022), the plaintiff's decedent not only had "a gun in his hand, raised to fire," but he actually exchanged gunfire with the officer who shot him. *See id.* at *1. In *Williams v. City of Scranton*, No. 3:10-CV-388, 2013 WL 1339027 (M.D. Pa. Apr. 1, 2013), the plaintiff's decedent did not merely have a weapon in her hand, but she had "rapidly approached [an officer] with a knife, ignored the officers' warnings to stop and drop the knife, and was within several feet of [the officer] when she was shot." *See id.* at *6; *see also id.* at *2 (noting that it was undisputed that the decedent had approached the officer "while pointing the knife at him" and that the entire incident occurred over "a

matter of seconds"). In *Gregor v. Johnsen*, No. 1:14-CV-219, 2017 WL 11368374 (M.D. Pa. Nov. 3, 2017), *R. & R. adopted*, 2019 WL 3549603 (M.D. Pa. Aug 5, 2019), a police officer observed a suspect slashing the tires of a police van with a knife and gave chase on foot; the officer lunged at the fleeing suspect who was armed with a knife, but missed and fell to the ground; the suspect then turned to face the prone officer with the knife still in his hand, and the officer shot him.

In their reply brief, the moving defendants have attempted to appropriate the *Aleman* decision cited by the plaintiff to support their own case. They point to language in the decision indicating that the *Aleman* plaintiff was not "making a furtive or threatening movement that would suggest he had an intent to use the weapon to harm the officer or anyone else," *Aleman*, 80 F.4th at 295–96, suggesting that Bentler was doing so in this case. But their reply brief cites to no evidence in the record that Bentler did make any such furtive or threatening movement with the rifle, and, viewing the evidence of record in the light most favorable to the non-moving plaintiff, we have found that while Bentler was holding the rifle at the time he was shot, it was pointed at the ground.

Accordingly, we find that the defendants have failed to meet their burden of persuasion with respect to the affirmative defense of qualified immunity.

### C. PSP and Qualified Immunity

The defendants contend that PSP is entitled to qualified immunity from the plaintiff's ADA and RA statutory claims.[21] But it is well established that government entities and other institutional defendants are simply not entitled to qualified immunity, which is available only to individual defendants sued in their *personal* capacity. *See Owen v. City of Independence*, 445 U.S. 622, 655–56 (1980) (holding that government entities are not entitled to qualified immunity and justifying qualified immunity for individual officers based on "the concern that the threat of *personal* monetary liability will introduce an unwarranted . . . consideration into the decisionmaking process"); *see also Walker v.*

---

[21] We note that, as a state agency, the PSP is not entitled to Eleventh Amendment immunity under the ADA with respect to conduct that also violates the Constitution. *See United States v. Georgia*, 546 U.S. 151, 159 (2006). Moreover, as a presumptive recipient of federal funds, PSP has waived Eleventh Amendment immunity with respect to Section 504 of the Rehabilitation Act. *See Durham v. Kelley*, 82 F.4th 217, 227 (3d Cir. 2023); *Koslow v. Pennsylvania*, 302 F.3d 161, 171 (3d Cir. 2002). Thus, qualified immunity is the only affirmative defense interposed by the defendants on behalf of PSP on summary judgment.

*Snyder*, 213 F.3d 344, 346 (7th Cir. 2000) ("Qualified immunity is a personal defense, which does not apply to institutional defendants in suits under federal statutes.") (citing *Owen*), *overruled on other grounds by Bd. of Tr. v. Garrett*, 531 U.S. 356, 374 n.9 (2001); *Encinias v. Sanders*, 570 F. Supp. 3d 1078, 1095 (D.N.M. 2021) (noting in the discovery context that "a state government agency . . . is not a public official entitled to assert qualified immunity"); *Armstrong v. Whalen*, 465 F. Supp. 3d 1165, 1175 (W.D. Wash. 2020) ("[Q]ualified immunity does not apply to Title II claims because qualified immunity is a defense afforded to officials sued in their individual capacities and Title II [of the ADA] authorizes suits against public entities, not individuals.") (internal quotation marks and brackets omitted).

### D. ADA and RA Claims on the Merits

In Counts IV and V of the complaint, Bentler asserts disability discrimination claims against the PSP under Title II of the ADA and Section 504 of the RA. Title II of the ADA provides that "no qualified individual with a disability shall by reason of such disability be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity or be subjected to discrimination by any

such entity." 42 U.S.C. § 12132. Section 504 of the RA provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subject to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

"Whether suit is filed under the Rehabilitation Act or under the Disabilities Act, the substantive standards for determining liability are the same." *McDonald v. Pennsylvania*, 62 F.3d 92, 95 (3d Cir.1995). To prevail on a claim under Title II of the ADA, a plaintiff "must demonstrate: (1) he is a qualified individual; (2) with a disability; (3) who was excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or was subjected to discrimination by any such entity; (4) by reason of his disability." *Haberle v. Troxell*, 885 F.3d 170, 178 (3d Cir. 2018) (quoting *Bowers v. Nat'l Collegiate Athletic Ass'n*, 475 F.3d 524, 553 n.32 (3d Cir. 2007) (brackets omitted). "Where compensatory damages are sought, a plaintiff must also show intentional discrimination under a deliberate indifference standard." *Durham v. Kelley*, 82 F.4th 217, 225 (3d Cir. 2023); *see also Furgess v. Pa. Dep't of Corr.*, 933 F.3d 285, 289 (3d Cir. 2019); *S.H. ex rel.*

*Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 263 (3d Cir. 2013). "The elements of a claim under the RA are the same, except that the plaintiff must also show that the program in question received federal dollars." *Durham*, 82 F.4th at 225; *see also CG v. Pa. Dep't of Educ.*, 734 F.3d 229, 235 n.10 (3d Cir. 2013).

### 1. *Exigent Circumstances Exception*

The defendants first argue that the plaintiff's disability discrimination claims are barred altogether under a categorical and atextual "exigent circumstances" exception to the ADA first articulated by the Fifth Circuit in *Hainze v. Richards*, 207 F.3d 795 (5th Cir. 2000). In *Hainze*, the Fifth Circuit held that "Title II does not apply to an officer's on-the-street responses to reported disturbances or other similar incidents, whether or not those calls involve subjects with mental disabilities, prior to the officer's securing the scene and ensuring that there is no threat to human life." *Hainze*, 207 F.3d at 801.

Other circuits have rejected *Hainze*'s categorical approach, holding that Title II of the ADA applies to law enforcement arrests and investigations with any exigent circumstances merely factoring into the reasonableness of the officer's actions or the requested accommodation.

*See Sheehan v. City & Cnty. of S.F.*, 743 F.3d 1211, 1232 (9th Cir. 2014) ("We agree with the majority of circuits to have addressed the question that Title II applies to arrests. . . . [E]xigent circumstances inform the reasonableness analysis under the ADA . . . ."), *rev'd on other grounds*, 575 U.S. 600 (2015); *Seremeth v. Bd. of Cnty. Comm'rs Frederick Cnty.*, 673 F.3d 333, 339 (4th Cir. 2012) ("[N]othing in the text of the ADA suggests that a separate exigent-circumstances inquiry is appropriate."); *id.* ("[W]hile there is no separate exigent-circumstances inquiry, the consideration of exigent circumstances is included in the determination of the reasonableness of the accommodation."); *Bircoll v. Miami-Dade Cnty.*, 480 F.3d 1072, 1085 (11th Cir. 2007) ("[T]he question is not so much one of the applicability of the ADA because Title II prohibits discrimination by a public entity by reason of [a person's] disability. The exigent circumstances presented by criminal activity and the already onerous tasks of police on the scene go more to the reasonableness of the requested ADA modification than whether the ADA applies in the first instance."); *see also King v. Hendricks Cnty. Comm'rs*, 954 F.3d 981, 988 (7th Cir. 2020) (assuming without deciding that Title II applied to an officer's use of lethal force against a subject who ran at him with a knife);

*Gray v. Cummings*, 917 F.3d 1, 17 (1st Cir. 2019) (assuming without deciding that "Title II of the ADA applies to ad hoc police encounters . . .and that exigent circumstances may shed light on the reasonableness of an officer's actions"); *Roell v. Hamilton Cnty.*, 870 F.3d 471, 489 (6th Cir. 2017) (assuming without deciding that Title II applies to arrests, but noting that decisions applying Title II to arrests "have also noted that the exigent circumstances inherent in an arrest inform the reasonable-accommodation analysis"); *cf. Gohier v. Enright*, 186 F.3d 1216, 1221 (10th Cir. 1999) ("[A] broad rule categorically excluding arrests from the scope of Title II . . . is not the law.") (rejecting a similar categorical rule that police protection was not an individualized benefit of a public entity's "services, programs, or activities" under the ADA). *But see Bahl v. Cnty. of Ramsey*, 695 F.3d 778, 785–86 (8th Cir. 2012) ("The duties of police officers during a traffic stop call for the exercise of significant judgment and discretion, and we will not second guess those judgments, where, as here, an officer is presented with exigent or unexpected circumstances. In these circumstances, it would be unreasonable to require that certain accommodations be made in light of overriding public safety concerns.") (citing *Hainze*). This court and other

district courts within this circuit have rejected it as well, albeit in the context of motions to dismiss. *See Washington v. Brown*, No. 3:23-CV-01632, 2024 WL 2214686, at \*13–15 (M.D. Pa. May 15, 2024); *Bentler v. Nederostek*, No. 3:22-1107, 2023 WL 3510822, at \*10 n.2 (M.D. Pa. 2023), Doc. 29; *Broadwater v. Fow*, 945 F. Supp. 2d 574, 591 n.15 (M.D. Pa. 2013); *Mohney v. Pennsylvania*, 809 F. Supp. 2d 384, 399–400 (W.D. Pa. 2011); *Arnold v. City of York*, 340 F. Supp. 2d 550, 554 & n.2 (M.D. Pa. 2004). *Hainze* has its critics even within the Fifth Circuit. *See, e.g.*, *Wilson v. City of Southlake*, 936 F.3d 326, 333 (5th Cir. 2019) (Ho, J., concurring in the judgment) ("In *Hainze* . . . , our court created a categorical 'exigent circumstances' defense that appears nowhere in the text of either the Americans with Disabilities Act or the Rehabilitation Act. So it is not surprising that every circuit to opine on this issue has to our knowledge rejected our approach.") (collecting cases).

The defendants nevertheless urge us to adopt the exigent circumstances exception articulated in *Hainze*. But we find *Hainze*'s categorical approach to be inconsistent with the approach employed by the Third Circuit in *Haberle v. Troxell*, 885 F.3d 170 (3d Cir. 2018), which is binding circuit precedent.

In *Haberle*, the Third Circuit examined a plaintiff's arrest-related ADA claim element by element to determine whether the ADA applies when police officers make an arrest. *See id.* at 178. With respect to the first element, it concluded that arrestees "can be 'qualified individuals' under the ADA, . . . for there is nothing to categorically exclude them from the statute's broad coverage." *Id.* at 179. Addressing the second element—whether arrestees may have disabilities covered by the ADA— the Third Circuit concluded that "the answer to that is clearly 'yes.'" *Id.* Turning next to the fourth element, the Third Circuit concluded that: "If the arrestee's disability played a role in the decisionmaking process and had a determinative effect on the outcome of the process, *i.e.,* if the arrestee's disability was a 'but for' cause of the deprivation or harm he suffered, then the fourth element of an ADA claim has been met." *Id.* (citation modified).

The Third Circuit then returned to the third, "most controversial" element: "[W]hether arrests made by police officers are 'services, programs, or activities of a public entity,' or alternatively, whether police officers may be liable under the ADA for 'subjecting a qualified individual to discrimination' while effectuating an arrest." *Id.* (brackets omitted).

The Third Circuit noted that courts across the country were divided on whether police investigation and arrests constitute "services, programs, or activities of a public entity." *Id.* at 180. But it declined to resolve that question, finding the alternative prong of the third element—whether the arrestee was "subjected to discrimination" by the police—was determinative, explaining:

> The "subjected to discrimination" phrase in Title II is a catch-all phrase that prohibits all discrimination by a public entity, regardless of the context. Moreover, we have said that discrimination under the ADA encompasses not only adverse actions motivated by prejudice and fear of disabilities, but also includes failing to make reasonable accommodations for a plaintiff's disabilities. It follows then, that police officers may violate the ADA when making an arrest by failing to provide reasonable accommodations for a qualified arrestee's disability, thus subjecting him to discrimination. Given that catchall, we believe that the ADA can indeed apply to police conduct during an arrest.

*Id.* (citations omitted) (citation modified); *see also Gray*, 917 F.3d at 16 (characterizing *Haberle* as "holding that Title II applies without exception to ad hoc police encounters").

It follows then that, "[u]nder this approach, exigent circumstances attendant to a police officer's decisions during an ad hoc encounter simply weigh in the balance when evaluating the reasonableness of a prospective

ADA accommodation." *Gray*, 917 F.3d at 16 (citing *Haberle*, 885 F.3d at 181 n.11); *Haberle*, 885 F.3d at 181 n.11 (acknowledging that "[t]he analysis as to what is 'reasonable' under the circumstances, *including exigent circumstances*, and as to how their determination is reached, presents complicated issues") (emphasis added); *see also Waller ex rel. Estate of Hunt v. City of Danville*, 556 F.3d 171, 175 (4th Cir. 2009) ("Reasonableness in law is generally assessed in light of the totality of the circumstances, and exigency is one circumstance that bears materially on the inquiry into reasonableness under the ADA. Accommodations that might be expected when time is of no matter become unreasonable to expect when time is of the essence.").

Thus, we decline to adopt and apply the Fifth Circuit's categorical exigent circumstances exception in this case. Moreover, even if the exigent circumstances exception were applicable to the adjudication of disability discrimination claims in the Third Circuit, based on the facts of record, viewed in the light most favorable to the non-moving plaintiff, we find that the level of exigency present at the time and place when Bentler was shot by Corporal Nederostek is a disputed material fact. *See Brodlic v. City of Lebanon*, No. 4:04-CV-978, 2005 WL 2250840, at *6 n.8

(M.D. Pa. Sept. 15, 2005).

### 2. *Prima Facie Case Under the ADA*

The defendants contend that the plaintiff is unable to establish a prima facie case under the ADA, presenting several cursory arguments seriatim.

### a. *Whether an Arrest is a Service or Activity Under the ADA*

The defendants first argue that the plaintiff's ADA claim fails as a matter of law because an arrest is not a "service" or an "activity" under Title II of the ADA. In support, the defendants note that, in *Haberle*, the Third Circuit declined to decide whether an arrest constitutes a service or activity under Title II. *See Haberle*, 85 F.3d at 180. But the reason the Third Circuit declined to determine whether an arrest constitutes a "service" or "activity" under Title II is "because § 12132 is framed in the alternative," and it instead looked "to the second phrase, namely, to whether the arrestee was 'subjected to discrimination' by the police." *Id.* As we noted above, under this second phrase, the Third Circuit held that "police officers may violate the ADA when making an arrest by failing to provide reasonable accommodations for a qualified arrestee's disability, thus subjecting him to discrimination." *Id.*

### b. *Whether the Plaintiff was a Qualified Individual*

The defendants next argue that the plaintiff's ADA and RA claims fail as a matter of law because, under the "significant risk" or "direct threat" exception, Bentler was not a "qualified individual" in light of his possession of a rifle and his failure to comply with orders from the state troopers.[22]

The direct threat (or significant risk) exception began as a judicially created doctrine first articulated by the Supreme Court in *School Board of Nassan County v. Arline*, 480 U.S. 273 (1987). *Doe v. Cnty. of Centre*, 242 F.3d 437, 447 n.6 (3d Cir. 2001). It stems from a recognition "of the importance of prohibiting discrimination against individuals with disabilities while protecting others from significant health and safety risks, resulting, for instance, from a contagious disease." *Bragdon v. Abbott*, 524 U.S. 624, 649 (1998).

In *Arline*, an elementary school teacher who had been fired from her job, solely because of her susceptibility to recurrent and contagious tuberculosis, brought a disability discrimination action under the

---

[22] The moving defendants also rely on Bentler's alleged pointing of the weapon at Corporal Nederostek and other individuals, which we of course disregard on summary judgment as a disputed material fact.

Rehabilitation Act.[23] The Supreme Court concluded that, although her tuberculosis clearly constituted a disability, and notwithstanding her other qualifications for the schoolteacher job, "[a] person who poses a significant risk of communicating an infectious disease to others in the workplace will not be otherwise qualified for his or her job if reasonable accommodation will not eliminate that risk." *Arline*, 480 U.S. at 287 n.16. The Court instructed that, to determine whether Arline was otherwise qualified for the job of elementary schoolteacher, "the district court will need to conduct an individualized inquiry and make appropriate findings of fact." *Id.* at 287. The Court further explained that:

> In the context of the employment of a person handicapped with a contagious disease, . . . this inquiry should include findings of facts, based on reasonable medical judgments given the state of medical knowledge, about (a) the nature of the risk (how the disease is transmitted), (b) the duration of the risk (how long the carrier is infectious), (c) the severity of the risk (what is the potential harm to third parties), and (d) the probabilities the disease will be transmitted and will cause varying degrees of harm.

*Id.* at 287–88 (internal quotation marks and brackets omitted). Finally, the district court was instructed to "evaluate, in light of these medical

---

[23] We note that the ADA was enacted three years later, in 1990.

findings, whether the employer could reasonably accommodate the employee under the established standards for that inquiry." *Id.* at 288. Finding the record on these issues inadequately developed, the Supreme Court remanded the case for further findings of fact. *Id.* at 289.

Following that decision, Congress amended the Rehabilitation Act to codify the Supreme Court's holding, although notably limited to the employment context only. *See* Civil Rights Restoration Act of 1987, Pub. L. No. 100-259, § 9, 102 Stat. 28 (1988) (codified at 29 U.S.C. § 705(20)(D)) ("For the purposes of sections 503 and 504, as such sections relate to employment, such term does not include an individual who has a currently contagious disease or infection and who, by reason of such disease or infection, would constitute a direct threat to the health or safety of other individuals or who, by reason of the currently contagious disease or infection, is unable to perform the duties of the job.").

When enacted in 1990, the ADA also codified *Arline* by incorporating the direct threat (or significant risk) exception into Title I of the ADA, which prohibits disability discrimination in the public and private employment context. *See* 42 U.S.C. § 12113 (providing employers with an affirmative defense to a discrimination charge based on

"qualification standards" that "may include a requirement that an individual shall not pose a direct threat to the health or safety of other individuals in the workplace"); *see also* § 12111(3) (defining "direct threat" as "a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation"). Shortly thereafter, the EEOC promulgated regulations to implement these statutory provisions. *See* 29 C.F.R. § 1630.15(b) (implementing 42 U.S.C. § 12113); 29 C.F.R. § 1630.2(r) (defining "direct threat" and codifying the *Arline* analytical framework).

The ADA also incorporated the direct threat (or significant risk) exception into Title III of the ADA, which prohibits disability discrimination by providers of public accommodations. *See* 42 U.S.C. § 12182(b)(3) ("Nothing in [Title III] shall require an entity to permit an individual to participate in or benefit from the goods, services, facilities, privileges, advantages and accommodations of such entity where such individual poses a direct threat to the health or safety of others. The term 'direct threat' means a significant risk to the health or safety of others that cannot be eliminated by a modification of policies, practices, or procedures or by the provision of auxiliary aids or services."). Shortly

thereafter, the Department of Justice promulgated a regulation to implement this statutory provision. *See* 28 C.F.R. § 36.208.

Upon enactment, Title II of the ADA, which prohibits disability discrimination by public entities regardless of activity,[24] did not include any similar reference to the direct threat or substantial risk exception. The implementing regulations promulgated by the Department of Justice shortly thereafter likewise omitted any reference to the direct threat or substantial risk exception. In promulgating those regulations, however, the Department commented on its regulatory definition of the term "qualified individual with a disability," noting that "[w]here questions of safety are involved, the principles established in § 36.208 [(implementing Title III)] will be applicable," and discussing the direct threat exception and application of the *Arline* analytical framework under Title II. Nondiscrimination on the Basis of Disability in State and Local Government Services, 56 Fed. Reg. 35694, 35701 (July 26, 1991). Notwithstanding the absence of any express statutory or regulatory

---

[24] *See New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 301 (3d Cir. 2007) ("Section 12132 of Title II of the ADA . . . constitutes a general prohibition against discrimination by public entities, regardless of activity.").

provision, the Third Circuit and other federal courts have applied the direct threat (or substantial risk) exception in the context of public entities on multiple occasions. *See, e.g.*, *New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 305–07 (3d Cir. 2007); *Doe*, 242 F.3d at 447–452. Eventually, the Department promulgated new regulations to codify the direct threat (or substantial risk) exception and application of the *Arline* analytical framework in the Title II public entity context. Nondiscrimination on the Basis of Disability in State and Local Government Services, 75 Fed. Reg. 56164, 56180 (Sept. 15, 2010) (codified at 28 C.F.R. § 35.139). This regulation provides:

> (a) [Title II] does not require a public entity to permit an individual to participate in or benefit from the service, programs, or activities of that public entity when that individual poses a direct threat to the health or safety of others.
>
> (b) In determining whether an individual poses a direct threat to the health or safety of others, a public entity must make an individualized assessment, based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence, to ascertain: the nature, duration, and severity of the risk; the probability that the potential injury will actually occur; and whether reasonable modifications of policies, practices, or procedures or the provision of auxiliary aids or services will mitigate the risk.

28 C.F.R. § 35.139. In another section, the regulations define "direct

threat" as "a significant risk to the health or safety of others that cannot be eliminated by a modification of policies, practices or procedures, or by the provision of auxiliary aids or services as provided in § 35.139." *Id.* § 35.104.

Typically, Title II cases involving application of the direct threat exception have dealt with communicable diseases or with laws restricting on the placement of substance abuse treatment services facilities.[25] *See, e.g. New Directions*, 490 F.3d 293 (challenge to state statute restricting placement of methadone clinics); *Doe*, 242 F.3d 437 (challenge to county policy precluding placement of non-HIV positive children in foster home that included an HIV-positive child with AIDS); *W. Easton Two, LP v. Borough Council of W. Easton*, 489 F. Supp. 3d 333 (E.D. Pa. 2020) (challenging local ordinance placing restrictions on operation of methadone clinic, and imposing additional fees on patients residing there). In *Haberle*, however, the Third Circuit acknowledged that there remained an open question whether, under the significant risk test, "a potentially violent person with mental health problems who, while

---

[25] Other cases involving the direct threat exception within this circuit mostly appear to arise in the employment (Title I) or public accommodation (Title III) contexts.

possessing a gun, barricades himself in another person's apartment is a 'qualified individual' under the ADA." *See Haberle*, 85 F.3d at 179 n.9. But the court expressly declined to address the applicability of the direct threat exception in the context of an arrest or use of force by police in that case, reserving the issue for another day. *Id.*

The moving defendants urge us to take up the issue reserved in *Haberle* and apply the direct threat (or significant risk) exception here to find that Bentler was not a qualified individual under the ADA because he posed a significant risk to the health or safety of others that could not be eliminated by any reasonable accommodation. But we decline to do so for two reasons.

First, as the Third Circuit has recognized, "the significant risk test requires a rigorous objective inquiry." *New Directions*, 490 F.3d at 305. "The existence, or nonexistence, of a significant risk must be determined from the standpoint of the person who refuses the . . . accommodation, and the risk assessment must be based on medical or other objective evidence." *Bragdon*, 524 U.S. at 649. A defendant's subjective "belief that a significant risk existed, even if maintained in good faith, would not relieve him from liability." *Id.; see also New Directions*, 490 F.3d at 306

("[W]e cannot base our decision on the subjective judgments of the people purportedly at risk . . . ."). Here, the defendants have relied solely on the subjective assessment of risk by Corporal Nederostek. They have failed to adduce the sort of "objective, scientific information" necessary to properly ascertain the nature, duration, and severity of the risk posed by Bentler at the time when Nederostek shot him, the probability that any potential injury would actually occur, or whether that risk could be eliminated by any reasonable accommodation. In sum, the moving defendants have failed to develop a sufficient record to support application of the direct threat (or significant risk) exception in this case.

Second, there remain genuine disputes of material fact with respect to elements of the direct threat (or significant risk) exception. The nature of the risk posed by Bentler is a disputed issue of material fact—the moving defendants have expressly relied on the factual contention that Bentler pointed or aimed his rifle at state troopers, which has been effectively disputed by the plaintiff. Whether any risk posed could be eliminated by reasonable accommodation is also a disputed issue of material fact—the moving defendants have failed to adduce any evidence whatsoever to suggest that any risk posed by Bentler could not be

eliminated or mitigated by reasonable accommodations.[26]

Thus, based on the evidence of record, viewed in the light most favorable to the non-moving plaintiff, we are unable to conclude that Bentler was not a "qualified individual" under the ADA in light of his possession of a rifle and his failure to comply with orders from the state troopers.

### c. Whether the Plaintiff Was Disabled

The defendants next argue that the plaintiff is unable to adduce sufficient evidence to establish that he was disabled for ADA purposes.

Under the ADA, the term "disability" is defined as: (1) "a physical or mental impairment that substantially limits one or more major life activities"; (2) "a record of such an impairment"; or (3) "being regarded as having such an impairment." 42 U.S.C. § 12102(1). "There is no question that a mental health disorder qualifies as a disability." *Williams v. Papi*, No. 3:13-CV-01151, 2016 WL 7155988, at *16 (M.D. Pa. Dec. 7, 2016)

---

[26] The plaintiff's complaint alleges several proposed reasonable accommodations, including, but not limited to: "employing the passage of time to advantage, using non-threatening communication, respecting the individual's comfort zone and not unreasonably agitating or exciting the individual and instead calming the situation." Compl. ¶ 170, Doc. 1. On summary judgment, the defendants have not raised any challenge at all with respect to the plaintiff's claims on this issue.

(citing *Conneen v. MBNA Am. Bank, N.A.*, 334 F.3d 318, 329 (3d Cir. 2003)), *rev'd in part on other grounds*, 714 Fed. App'x 128 (3d Cir. 2017).

The plaintiff has responded by pointing to evidence of his disability in the record. In or about 2014, Bentler was diagnosed with depression, anxiety, post-traumatic stress disorder, and bipolar disorder.[27] He was prescribed multiple medications related to those diagnoses, but which he stopped taking in the months prior to the boat launch incident. At his deposition, Bentler testified that his mental health conditions impacted his daily life in that he was subject to constant mood changes, an inability to socialize, feelings of isolation, and fear of large groups. Pl. Ex. B (Bentler Dep. Tr.), at 91–94, Doc. 71-2. He testified that, on the date of the boat launch incident, his various mental health symptoms were

---

[27] Although courts must "determine the existence of disabilities on a case-by-case basis," *see Albertsons, Inc. v. Kirkingburg*, 527 U.S. 555, 566 (1999), mental health impairments such as these have previously been recognized as disabilities by both federal courts and federal agencies under appropriate circumstances. *See, e.g.*, 29 C.F.R. § 35.108(d)(2)(iii) (recognizing that "it should easily be concluded that" mental impairments such as "[m]ajor depressive disorder, bipolar disorder, [and] post-traumatic stress disorder" "will, at a minimum, substantially limit . . . brain function"); *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306–11 (3d Cir. 1999) (finding a genuine dispute of material fact with respect to whether a plaintiff's bipolar disorder substantially limited her ability to think even while receiving treatment, such that it constituted a disability under the ADA).

intensified, stating that it "just seemed like my world was crashing down for some reason" and that his "anxiety was through the roof because I didn't know what was going to really happen." *Id.* at 84. Bentler called 911 from the boat launch, informing the operator that he needed medical help because he was not mentally stable. Pl. Ex. I-1 (911 call recording, pt. 1), Doc. 74. After explaining his location, Bentler stated to the operator: "I'm just not in the right state of mind. I feel like hurting myself or someone else. I just need help." *Id.* Bentler later stated to the operator: "Please don't send people to excessive force me because I'm not in the right state of mind so I don't know what I'm capable of. I need to go to the hospital to get checked out." Pl. Ex. I-2 (911 call recording, pt. 2), Doc. 74. He later told the operator that: "I haven't been in the right state of mind for a couple of days now," and that "I have a gun, I have a knife, . . . I don't know what the fuck I'm doing." *Id.* The 911 dispatcher contacted a PSP dispatcher to relay the call information, informing PSP that Bentler was armed and that he was "out of his mind" and "not in the right state of mind." Pl. Ex. J-3 (PSP dispatch call recording, pt. 3), Doc. 74. The PSP dispatcher relayed to the responding state troopers that Bentler was not in a good place and needed help.

Based on the evidence of record, viewed in the light most favorable to the non-moving plaintiff, a reasonable jury could conclude that Bentler suffered from one or more mental impairments that substantially limited one or more major life activities, or that he was regarded as having such an impairment, and that he was therefore disabled for ADA purposes.

### d. Whether the PSP was Aware of Bentler's Disabilities

The defendants next argue that the plaintiff is unable to adduce sufficient evidence that PSP was aware of Bentler's disability.

The plaintiff has responded by pointing to evidence in the record that PSP was indeed aware of his disability. In addition to information conveyed to and between county and PSP dispatchers and responding state troopers, as set forth above, the record includes documentary evidence indicating that PSP had at least twenty-one prior contacts with Bentler. A check of PSP's Query Initial Crime (QIC) database revealed thirteen records identifying Bentler as a suspect or accused, and a check of PSP's Computer-Aided Dispatch (CAD) database revealed an additional eight incidents involving Bentler. Moreover, CAD included numerous "CAUTION" flags attached to Bentler's record: "Combative," "Escape History," "Known Drug User," "Mentally Unstable," "Violent

Tendencies," and "Suicidal." CAD also included a noted disability: "Mental Disability / Senile." Defs. Ex. 2 (Gen. Offense Rep.), at 20, Doc. 58-2. The record includes investigatory interview transcripts in which Corporal Nederostek admitted that he had been informed by dispatch that Bentler was "in a bad mental state and needed help," Pl. Ex. D (Nederostek Interview Sept. 18, 2020), at 4, Doc. 71-4; *see also* Pl. Ex. E (Nederostek Interview July 23, 2020), at 1, Doc. 71-5, in which Trooper Smith admitted that dispatch had informed them that Bentler was "not in a good place," and thus "could be a danger to himself or others," Pl. Ex. F (Smith Interview Sept. 17, 2020, at 12, Doc. 71-6, and in which Trooper Yanochko acknowledged having previously assisted with a "302" civil commitment involving Bentler, Pl. Ex. G (Yanochko Interview July 20, 2020), at 5, Doc. 71-7.

Based on the evidence of record, viewed in the light most favorable to the non-moving plaintiff, a reasonable jury could conclude that PSP was aware of Bentler's longstanding mental health and behavioral issues, as well as the mental health crisis occurring at that moment, and thus it was aware of his disability.

### e. Whether PSP was Deliberately Indifferent

The defendants next argue that, to the extent he seeks to hold PSP liable under a failure-to-train theory, the plaintiff is unable to adduce sufficient evidence that PSP was deliberately indifferent to Bentler's protected rights.

Because Bentler seeks compensatory damages, he must demonstrate intentional discrimination by PSP under a deliberate indifference standard. To establish deliberate indifference, an ADA or RA claimant must show "(1) knowledge that a federally protected right is substantially likely to be violated and (2) failure to act despite that knowledge." *Haberle*, 885 F.3d at 181 (ellipsis omitted); *see also Durham*, 82 F.4th at 226. With respect to a government or corporate entity, the knowledge element may be met in one of two ways: (a) by showing that "existing policies caused a failure to adequately respond to a pattern of past occurrences of injuries like the plaintiffs'"; or (b) by showing "that the risk of cognizable harm was so great and so obvious that the risk and the failure to respond will alone support finding deliberate indifference." *Haberle*, 885 F.3d at 181 (citation modified). Bentler relies on the second option, contending that risk of harm was "so great and so obvious."

The moving defendants have pointed to evidence that PSP has adopted policies and, pursuant to those policies, established both entry-level and continuing-education training programs for its members concerning uses of force and situations involving individuals with mental illness. The non-moving plaintiff, meanwhile, has pointed to an employee training transcript for Corporal Nederostek and to his own deposition testimony to suggest that the individual defendant received no training or inadequate training with respect to situations involving interaction with individuals suffering from mental health disabilities. The plaintiff further points to the conduct of Corporal Nederostek and Trooper Smith during the boat launch incident, which contravened PSP's official policy and procedures for incidents involving persons with mental illness or mental health emergencies. Moreover, as the plaintiff has noted, while the defendants produced copies of certain PSP policies and Corporal Nederostek's training transcript in discovery, no training materials were produced to substantiate whether or to what extent Nederostek, Smith, Yanochko, or PSP troopers in general received training on de-escalation or other mental-health related police practices.

Based on the evidence of record, viewed in the light most favorable

- 61 -

to the non-moving plaintiff, a reasonable jury could conclude that, despite knowing of the obvious risk that its troopers might discriminate on the basis of disability or fail to make reasonable accommodations when encountering individuals with mental health conditions, the PSP failed to provide its troopers with adequate specialized training for interacting with such individuals with mental health conditions, and that PSP was therefore deliberately indifferent to Bentler's protected rights.

### f. Whether PSP May Be Held Vicariously Liable

The defendants next argue that PSP cannot be held vicariously liable under the ADA or the RA for the deliberately indifferent conduct of its employees.

Although the Third Circuit has not addressed this issue, this court and others within this circuit have repeatedly held that a public entity may be held vicariously liable for money damages under the ADA and RA for the purposeful or deliberately indifferent conduct of its employees. *See Ankey v. Paradise Twp.*, No. 1:24-CV-01654, 2025 WL 2884820, at \*13 (M.D. Pa. Oct. 9, 2025) ("Under Title II of the ADA, public entities are vicariously liable for the actions of their employees."); *Washington*, 2024 WL 2214686, at \*10 (holding that PSP may be held vicariously liable

under the ADA and RA for the deliberately indifferent acts of its officers); *see also Burton v. Cocker*, No. 25-454, 2026 WL 184523, at *4 (D. Del. Jan. 23, 2026) (finding plaintiff had stated plausible ADA and RA claims against municipal police departments where responding municipal police officers knew the plaintiff was an emotionally disturbed person but responded aggressively and did not attempt to de-escalate the situation or use nonlethal force), *R. & R. adopted*, 2026 WL 374565 (D. Del. Feb. 10, 2026); *Cappel v. Aston Twp. Fire Dep't*, 693 F. Supp. 3d 467, 489 (E.D. Pa. 2023) ("Under Title II of the ADA, . . . public entities are vicariously liable for the acts of their employees." (internal quotation marks and brackets omitted)); *Geness v. Pennsylvania*, 503 F. Supp. 3d 318, 339–40 (W.D. Pa. 2020) (holding that the Commonwealth of Pennsylvania may be held vicariously liable under the ADA for deliberately indifferent conduct by state trial court judges); *Waters v. Amtrak*, 456 F. Supp. 3d 666, 671 (E.D. Pa. 2020) ("When a public entity . . . is sued under Title II [of the ADA], the entity is vicariously liable for the acts of its employees."); *Sharrow v. Bailey*, 910 F. Supp. 187, 195 (M.D. Pa. 1995) (noting that a hospital may be held vicariously liable under the ADA for

the conduct of a physician-surgeon if employed by the hospital).[28]

The moving defendants have identified no reason to depart from this line of authority.[29] Thus, we find that, as a public entity, PSP may be held vicariously liable for the deliberately indifferent acts of the responding state troopers under Title II of the ADA and under Section 504 of the RA.

> g. *Whether Any Action Was Taken By Reason of Disability*

Finally, the defendants argue that the plaintiff is unable to adduce sufficient evidence of causation—that is, that the responding state

---

[28] Most federal circuit courts to address this same issue agree. *See, e.g., Delano-Pyle v. Victoria Cnty.*, 302 F.3d 567, 574–75 (5th Cir. 2002) ("[W]hen a plaintiff asserts a cause of action against an employer-municipality, under either the ADA or the RA, the public entity is liable for the vicarious acts of *any* of its employees as specifically provided by the ADA."); *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1141 (9th Cir. 2001) ("When a plaintiff brings a direct suit under either the Rehabilitation Act or Title II of the ADA against a municipality (including a county), the public entity is liable for the vicarious acts of its employees."); *Rosen v. Montgomery Cnty.*, 121 F.3d 154, 157 n.3 (4th Cir. 1997) ("[W]e reject the County's first argument that there is no respondeat superior liability under the ADA and that the County can only be held [liable] for a *policy* of discrimination."). *But see Jones v. City of Detroit*, 20 F.4th 1117, 1121–22 (6th Cir. 2021) (finding no vicarious liability under the ADA or the RA).

[29] The moving defendants' supporting and reply briefs cite no case law that directly supports their argument. *See* Defs. Br. Supp. 36–37; Defs. Reply Br. 16.

troopers' actions at the boat launch were taken because of Bentler's disability.

The Third Circuit prescribed the applicable legal standard for this fourth element of a disability discrimination claim—whether the plaintiff was "excluded from a service, program, or activity or discriminated against by reason of his disability"—in its *Haberle* decision: "If the arrestee's disability played a role in the decisionmaking process and had a determinative effect on the outcome of that process, *i.e.*, if the arrestee's disability was a 'but for' cause of the deprivation or harm he suffered, then the fourth element of an ADA claim has been met." *Haberle*, 885 F.3d at 179 (citation modified) (quoting another source); *see also Washington*, 2024 WL 2214686, at *11 (quoting *Haberle*). While a disabled plaintiff may establish causation by showing that he was treated *differently* than similarly situated non-disabled individuals, he can also establish causation by showing that the defendant failed to make reasonable accommodations for the plaintiff's disabilities, treating him the *same* as other non-disabled individuals but without accounting for his disabilities. *See Haberle*, 885 F.3d at 180 ("[P]olice officers may violate the ADA when making an arrest by failing to provide reasonable

accommodations for a qualified arrestee's disability, thus subjecting him to discrimination."); *Washington*, 2024 WL 2214686, at *12 (finding causation plausibly alleged where complaint alleged that responding officers were aware that the decedent had a disability and nevertheless responded with significant force and did not employ de-escalation tactics); *see also Snider v. Motter*, No. 4:13-CV-01226, 2016 WL 4154927, at *8 (M.D. Pa. Aug. 4, 2016) (finding that issuance of misconducts for manifestations of inmate-plaintiff's mental illness and punishing him in the same way as other non-mentally ill inmates would have been punished constituted a failure to provide reasonable accommodations, and thus cognizable disability discrimination), *R. & R. adopted*, 2016 WL 4140728 (M.D. Pa. Aug. 4, 2016).

Based on the evidence of record, viewed in the light most favorable to the non-moving plaintiff, a reasonable jury could conclude that the responding state troopers failed to provide reasonable accommodations for Bentler's current mental health emergency and his more longstanding mental health disabilities, eschewing de-escalation tactics and subjecting him to significant and deadly force instead, thereby subjecting Bentler to discrimination on the basis of his disability.

## IV.    CONCLUSION

For the foregoing reasons, the defendants' motion for summary judgment will be denied. This matter will be set down for trial on the plaintiff's remaining claims under Counts I, IV, and V of the complaint.

An appropriate order follows.

Dated: May 1, 2026                    *s/Joseph F. Saporito, Jr.*
                                      JOSEPH F. SAPORITO, JR.
                                      United States District Judge